Marie Claudia **OLIVIER**, Appellant,

*v.*

The **STATE** of Texas, Appellee.

No. A14–91–00745–CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 11, 1993.

Rehearing Denied April 1, 1993.

Allen C. Isbell, Houston, for appellant.

Karen A. Clark, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Appellant, Marie Claudia Olivier, appeals her judgment of conviction for the offense of murder. TEX.PENAL CODE ANN. § 19.02 (Vernon 1989). The jury rejected appellant's not guilty plea by reason of insanity and assessed punishment at twenty (20) years confinement in the Institutional Division of the Texas Department of Criminal Justice. We reverse the trial court's judgment and remand for a new trial.

Appellant brings two points of error on her appeal. She asserts that her conviction should be reversed because the verdict which implicitly rejected her affirmative defense of insanity, is so against the great weight and preponderance of the evidence as to be manifestly unjust. She also claims that the trial court committed error by allowing the prosecutor to mislead the venire into believing the insanity defense requires proof that the mental condition caused the criminal act.

This is a case where appellant, in a psychotic episode highly charged with delusions and hallucinations, kills her 14 month old infant child, Amelia Leona Olivier. The assistant medical examiner, Vladimir M. Parungao, testified that the injuries to the infant's head would be consistent with her

head being beaten against a wall. He also stated that the abrasions and contusions found around the neck area would be consistent with someone placing their hands around her neck in a choking-type fashion.

■ Appellant presented the affirmative defense of insanity which she had the burden to prove by a preponderance of the evidence. The standard of review applicable to this case is set forth in *Meraz v. State* in which the Court of Criminal Appeals held:

> When the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved his affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, *the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust.*

785 S.W.2d 146, 154–55 (Tex.Crim.App. 1990) (emphasis added).

Appellant raised the affirmative defense pursuant to TEX.PENAL CODE ANN. § 8.01(a) which provides:

### § 8.01 Insanity

(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know his conduct was wrong.

Appellant had the burden of proof and burden of persuasion pursuant to TEX.PENAL CODE ANN. § 2.04:

### § 2.04 Affirmative Defense

(a) An affirmative defense in this code is so labeled by the phrase: "It is an affirmative defense to prosecution...."

(b) The prosecuting attorney is not required to negate the existence of an affirmative defense in the accusation charging commission of the offense.

(c) The issue of the existence of an affirmative defense is not submitted to the jury unless evidence is admitted supporting the defense.

(d) If the issue of the existence of an affirmative defense is submitted to the jury, the court shall charge that the defendant must prove the affirmative defense by a preponderance of evidence.

■ Appellant seeks a factual review relevant to her affirmative defense; not a sufficiency review as to whether there was sufficient evidence to warrant a conviction. "The two reviews are mutually exclusive." *Meraz v. State*, 785 S.W.2d at 153. The Court of Appeals is constitutionally vested with the authority to determine whether a jury finding is against the great weight and preponderance of the evidence. TEX. CONST. art. V, § 6; *Meraz v. State*, 785 S.W.2d at 154. The Court of Appeals does not have to accept the implicit finding by the jury that the appellant did not prove her affirmative defense by a preponderance of the evidence if such finding is irrational. The issue is the adequacy of the proof of insanity which appellant presented in discharging her burden of proof and burden of persuasion, and whether the jury's implicit rejection of that proof is so against the preponderance of the evidence as to be manifestly unjust.

In *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986), the Supreme Court imposed the following safeguards in order to secure the sanctity of the jury trial when the court of appeals was in the process of exercising its conclusive factual authority:

> In order that this court may in the future determine if a correct standard of review of factual insufficiency points has been utilized, courts of appeals, when reversing on insufficiency [great weight and preponderance of the evidence] grounds, should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what re-

gard the contrary evidence greatly outweighs the evidence in support of the verdict. It is only in this way that we will be able to determine if the requirements of *In Re King's Estate* [150 Tex. 662, 244 S.W.2d 660 (1951)] have been satisfied.

See also *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex.1988).

At trial the Court instructed the jury that it is an affirmative defense to prosecution that, at the time of the conduct charged, the defendant, as a result of severe mental disease or defect, did not know that her conduct was wrong. The severe mental disease or defect must have existed at the very time or times inquired about, that is, at the very time of the alleged commission of the offense. The burden of proof, as to this affirmative defense, is upon the defendant to prove by a preponderance of the evidence. By the term "preponderance of the evidence" is meant the greater weight and degree of the credible evidence in the case.

█ In her first point of error, appellant asserts that the finding of the jury rejecting her affirmative defense of insanity is against the great weight and preponderance of the evidence. The evidence on the issue of insanity was lengthy, convincing, and uncontradicted. Three medical experts testified that appellant was legally insane on the date of offense. The State offered no expert testimony evidence to rebut appellant's insanity defense, relying instead on its cross examination of appellant's expert witnesses. There is no testimony, medical or lay, from which any rationale trier of fact could conclude that appellant was sane at the time of the offense.

The appellant testified that she is 35 years old and has been institutionalized numerous times for mental illness. She has been in psychotherapy since high school. As a young adult, she received electro-shock treatments in Memorial Southwest Hospital and in Methodist Hospital in Houston, Texas. She was treated at St. Mary's Psychiatric Hospital in Galveston, Texas, a few days before the offense. During the period before the offense, she was taking Elavil and Vicodin but stopped taking the medication after she was influenced by some Charismatic Christians.

In March 1990, appellant met Ottawa and Alice Pullen. He was her guidance counselor at Barclay Career School. During a session in Mr. Pullen's office when appellant was very upset and in pain, Pullen asked if she was "saved." He called Alice and the three of them prayed over the telephone. He invited appellant to Victory Christian Center, a nondenominational Charismatic Church that emphasizes "deliverance" and faith healing. Appellant and the Pullens prayed and had Bible studies together. They would pray in "tongues" and go around the house and "praise the Lord" by clapping their hands. She attended the Victory Church two times. The Pullens talked about Satan and demons and the "gift of healing" by the laying of hands. Alice Pullen once "performed" the "laying of hands" on Amelia when she was irritable and crying, telling Satan "to be gone." Alice told appellant that Satan was causing Amelia to be ill.

A few days before Amelia was killed, appellant went to the John Sealy Hospital in Galveston regarding some problems with tubes which were in her stomach. Amelia stayed with the Pullens. Appellant was transferred to St. Mary's psychiatric hospital. She called the Pullens. Pullen claimed to be her paster or minister, and the hospital allowed him to talk with her. He told her about a Dr. Walker who had treated Reverend John Osteen's wife, and who also believed in "faith healing". Appellant wanted to leave the psychiatric hospital. Appellant and Ottawa Pullen threatened a lawsuit if the hospital kept her against her will. The psychiatric hospital did not have commitment papers, and released appellant against medical advice. The Pullens picked her up in Galveston and drove her to her apartment at 6515 Hillcroft.

When they arrived, appellant sensed there were demons and evil spirits in the apartment. Ottawa said he would come in and "bless" the house. They formed a

prayer circle in the apartment by holding hands. Ottawa prayed in "tongues" to "bless the apartment". In the middle of the night, appellant began "feeling things" and having real bad problems. She saw candles burning in the apartment and drawers opening and shutting. She saw a lizard in the apartment and thought it was a sign of the devil. A friend, Diana, who had been staying in appellant's apartment for a few days, was asleep. Appellant thought Diana was probably Satan too. She ran out of the apartment and walked the streets. Remembering that God would "save" her if she was in the "light", she walked in the middle of the street. From a pay phone she called Ottawa Pullen and told him about the lizard and evil spirits in the apartment and that Diana was one of them, too. Meanwhile, Diana had run after appellant and had caught up with her at the pay phone. Pullen prayed in "tongues" over the phone. It was 2 or 3 a.m., and she refused to return to the apartment until Pullen had blessed it again. She waited at Two Pesos until daylight.

At daylight, she started catching metro buses, getting off "where God told me to get off." This getting on and off lasted a while. She called a friend to tell her that she was in danger and had no money. The friend wired her money at the Western Union. While she was waiting for Alice Pullen to get off work, she walked the downtown streets, preaching to street people and buying them food at McDonalds with the money her friend sent.

When Alice Pullen got off work, she and appellant went to the Pullens' home and attended Victory Church at night. Appellant had hands laid on her on this night and she was "slain in the Spirit" meaning she fell to the ground unconscious. She thought she was "healed" and took her medical alert bracelet off and threw it away. She had been without the drugs Elavil and Vicodin for several days now. She did not sleep that night.

The next night, appellant killed Amelia. That night, appellant, deprived of her prescribed medication, became real restless and went into a daze. Alice and she read the Bible, and Alice gave her some tapes. One tape was about a little boy who played chess with the devil and outsmarted him. Ottawa Pullen talked to her about the end of the world coming. This was the night that Alice Pullen laid hands on Amelia and told Satan to be gone and to quit making the baby sick.

In the middle of the night, appellant began hallucinating and hearing things. She kept remembering things about the devil and began seeing things. She believed the world was coming to an end and thought she was going to hell because she was not saved properly. All kinds of wild things were coming out of the walls, the drawers were moving, and she thought Amelia had turned into Satan. The dog came into her room and appellant believed the Pullens had died and gone to heaven because the dog never left their room unless they were gone. She felt like she was wrestling with something bigger than life. It was terrifying. She believed she was going to hell with the devil, if she did not kill this "thing" which she was wrestling with. This "thing" in bed with her was trying to kill her. She knew she had to kill it before it killed her. This "thing" was Amelia. She also defecated on herself.

The next morning when she woke up, Amelia was behind the bed dead. She ran to the Pullens' room. Ottawa Pullen got some "Holy Oil" and anointed the dead baby's head and appellant's head. Appellant called 911. Immediately after her arrest, appellant was put in the "rubber room" at the jail and was put on antipsychotic drugs.

Dr. Edward G. Silverman is a clinical psychologist and a consultant to Harris County Forensic Psychology Unit, with impeccable credentials. Dr. Silverman was ordered by the Court to exam appellant to determine her sanity at the time of the offense and also to determine her present competency to stand trial. This order resulted from a joint motion filed by the State and appellant's attorney. Dr. Silverman testified that he has evaluated over 1500 defendants to determine sanity at the time of the offense, determining that about

one percent of these were insane. He interviewed appellant on September 13, 1990. His initial task was to determine her competency to stand trial. He concluded that she was incompetent to stand trial at that time, and a jury determined that this was a correct diagnosis. At that time, she was too impaired mentally to evaluate her sanity at the time of the offense. Appellant was sent to Vernon State Hospital for treatment on October 18, 1990, and discharged on February 21, 1991. Subsequently on March 18, 1991, Dr. Silverman examined her again to reassess her competency to stand trial and to evaluate sanity at the time of the offense. This evaluation was again by order of the Court and again on a joint motion of the State and appellant's attorney. This time Dr. Silverman found appellant competent to stand trial.

Regarding the sanity issue, Dr. Silverman concluded that "... due to a severe mental disease or mental defect, that she was unable to know that her conduct, the conduct with which she was charged, was wrong." In making this evaluation, Dr. Silverman was aware that appellant also suffers from "Munchausen's Syndrome." The official name for this syndrome in psychiatric terminology is factitious disorder with physical symptoms. "Muchausen's Syndrome" is a chronic and more serious form of that factitious disorder. A person with this disorder intentionally fabricates or induces physical symptoms in himself for no other purpose than to assume a sick role and to have himself hospitalized. The person may complain about pains or ailments that do not exist. He may induce the symptoms, like injecting himself with a substance that will create an abscess or do something else destructive to create a physical ailment. In "Munchausen's Syndrome," the patient is not doing this for the purpose of compensation or to get himself out of a predicament. He does it solely for the purpose of adopting a sick role and becoming hospitalized.

Appellant acknowledged that she suffered from "Munchausen's Syndrome" and has falsified physical symptoms in order to be hospitalized. She had probed needles into her stomach to cause an abscess that would require hospitalization. She admitted that she had misled doctors by claiming symptoms which caused them to perform unnecessary surgeries. Dr. Silverman took into consideration the fact that appellant suffered from "Munchausen's Syndrome" when he made his evaluation and diagnosis. He was aware of her medical and psychiatric history.

He testified that appellant also suffers from a schizo-defective disorder. A schizo-defective disorder is a category used for patients who are exhibiting symptoms of schizophrenia, like delusions or hallucinations, and at the same time they are exhibiting symptoms of a major defective disorder such as extreme depression or extreme euphoria, or extreme irritability, similar to a manic phase.

Dr. Silverman stated that he relied on the following sources of data in making his evaluation: (1) what appellant told him; (2) statements given to the police by other people who were at or around the scene at the time of the alleged offense; (3) information from staff members on the Psychiative–Treatment Unit at the Harris County Jail; and 4) medical references and reports from Vernon State Hospital. Under cross-examination by the State, Dr. Silverman stated "[t]hat's part of my job, is to try to have a sense as to whether somebody is just making up all that stuff." "And so for example in this case, it's my opinion that Ms. Olivier is suffering and was suffering at the time from a mental illness."

After Dr. Silverman submitted his report finding appellant to be insane at the time of the offense, the State's attorney filed another motion requesting yet another evaluation of appellant's sanity. The Court granted the State's motion and ordered Dr. Jerome B. Brown, a clinical psychologist and a consultant to the Harris County Forensic–Psychology Unit, to conduct a psychiatric examination of appellant to determine her sanity at the time of the offense. Dr. Brown also has impeccable credentials. He testified that he has evaluated over 6000 defendants regarding insanity during his 21 years as a consultant to Harris

County courts. He had determined that only about 5% were legally insane.

Dr. Brown was aware that appellant suffers from "Munchausen's Syndrome" as well as a schizo-defective disorder. In his opinion, the evidence of legal insanity was "very compelling." In sum, Dr. Brown concluded:

> The evaluation ... revealed her to be suffering from a severe mental illness, a psychotic state, at the time this offense occurred, and as a result of that, she was unable to differentiate right from wrong because of that mental illness.

Under Cross-examination by the State, Dr. Brown also stated that he considered the possibility that appellant could be lying and rejected this theory. Dr. Brown stated that he believed that appellant acted out of a psychotic misperception, that somehow she was struggling with the devil or demon or something equivalent at that moment.

Dr. Fred L. Fason, a psychiatrist well-known in the field of forensic psychiatry, also examined appellant. He has made about 2000 examinations regarding insanity at the time of an offense, and has concluded that only about five percent were legally insane. His diagnosis was:

> Yes. My conclusion was, after speaking with her, that, number one, that she suffered from an illness which can best be termed as schizophrenic illness or schizophrenia. That at the time of the alleged offense, the illness prevented her from appreciating the wrongfulness of the conduct which led to the charges against her. That she was operating under a delusional belief, which is a symptom of the illness schizophrenia and that delusion, that is, the delusional belief that the baby was Satan, is what prevented her from appreciating the wrongfulness of her conduct and, therefore, it is my opinion she was legally insane at the time of the alleged offense.

Dr. Hazel Leler has a Ph.D. from Stanford University with a major in child development. She directed a large research project in parent/child relationships at the University of Houston for seven years. Appellant rented a room in Dr. Leler's house for ten months. She testified that appellant and the child Amelia had a beautiful relationship and that the child was always clean, happy, and healthy. Dr. Leler admired appellant as a wonderful mother. When she learned that appellant had killed Amelia, her reaction was and still is that appellant was the last person in the world to do something like that. Appellant's loving behavior toward the child before the tragic night is evidence that appellant was in a psychotic episode, highly charged with delusions and hallucinations, when she killed her own child.

### The State's Position and Evidence Against Insanity

After Dr. Silverman filed his sanity evaluation of March 18, 1991, where he found her insane as of the time of the offense, the State asked the Court to have her re-evaluated to determine her sanity. The Court ordered appellant to be examined by Dr. Jerome B. Brown, who is also a clinical psychologist with the Harris County Phrenetic Psychiatric Services. Dr. Brown filed his sanity evaluation report with the Court and also found her of unsound mind on or about the date of the offense.

The State's position at trial was that appellant was faking her mental illness. During the cross-examination of Dr. Silverman and Dr. Brown and in its jury argument, the State pointed to the following:

1) That the Doctors relied extensively on what appellant told them about what happened at the time of the offense.

2) That because of her education and training as a nurse and her education in psychology and a person well-versed in this area and by working in a psychiatric ward, she was able to fake her mental illness and fool the doctors; and

3) That because appellant had a history of MUNCHAUSEN'S SYNDROME she may have made up and fabricated her psychological symptoms such as hallucinations and fooled the doctors.

Doctors, Silverman, Brown, and Fason, who were expert witnesses, were aware of appellant's nurse's education and training

and her history of Munchausen's Syndrome when they made their sanity evaluation that she was legally insane at the time of the offense. Both Silverman and Brown stated that in their opinion, appellant was not faking her mental illness. The State did not present any expert testimony to contradict the expert testimony of the three doctors. After reviewing all the evidence in the record relevant to the issue of appellant's sanity, we must conclude that the verdict of the jury, which implicitly rejected the affirmative defense of insanity, is so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant's point of error one is sustained and the trial courts judgment is reversed and the cause is remanded for a new trial.

In appellant's second point of error, she asserts that the trial court committed reversible error by allowing the prosecutor to mislead the venire into believing the insanity defense requires proof that the mental condition caused the criminal act. Appellant argues that the trial court erred in allowing the prosecutor to tell the jury during voir dire that, in order to prove the affirmative defense of insanity by a preponderance of the evidence, appellant had to establish both that she suffered from a mental illness, and that the mental illness caused her to commit the act with which she was charged. Appellant contends that since the statute providing for the affirmative defense of insanity was amended in 1983, a defendant need no longer show that his mental illness caused him to commit the conduct constituting the offense with which he is charged.

Prior to 1983, the statute providing for the affirmative defense of insanity read as follows:

It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong **or was incapable of conforming his conduct to the requirements of the law he allegedly violated.**

TEX.PENAL CODE ANN. § 8.01(a) (Vernon 1979).

Under this statute, proof of a mental disease or defect alone was not sufficient to establish the affirmative defense of insanity. *Schuessler v. State*, 719 S.W.2d 320 (Tex.Crim.App.1986). A defendant was required to establish, first, the existence of a mental disease or defect; and, second, a causal connection between the mental disease or defect and at least one of the two prongs of the test for legal insanity. *Id.*

In 1983, the Texas Legislature amended the statute. It now reads as follows:

It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

TEX.PENAL CODE ANN. § 8.01(a) (Vernon Supp.1993).

The Legislature did not delete the language requiring a defendant to prove that *as a result of* severe mental disease or defect, he did not know that his conduct was wrong. Instead, it simply chose to no longer provide the insanity defense in situations where a defendant claims that he was incapable of conforming his conduct to the requirement of the law he allegedly violated. The language of the insanity statute clearly requires the defendant to prove that his mental disease or defect caused him to commit the conduct constituting the offense with which he is charged, because he was unaware that such conduct was wrong. The mental condition must cause the defendant's inability to distinguish right from wrong. *Morris v. State*, 744 S.W.2d 290, 295 (Tex.App.—Corpus Christi 1987, pet. ref'd); *Schuessler v. State*, 719 S.W.2d at 329. The holding in *Schuessler*, that a defendant must also establish a causal connection between his mental disease or defect and the test for legal insanity, has not been overruled. However, it obviously no longer applies to the deleted prong of the insanity test. Moreover, the principle that proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity is still valid.

Appellant has cited no authority for the proposition that this principle has been overruled.

The statute requires that a defendant prove that he was unaware that his conduct was wrong *as a result of* severe mental disease or defect. The words "as a result of" require a defendant to prove a causal connection between his mental disease or defect and the conduct constituting the offense with which he is charged. We find that the court correctly allowed the prosecutor to voïr dire the jury on the principle that a defendant must prove that his conduct was caused by his mental illness and to argue that same principle during closing argument to the jury. Appellant's second point of error is overruled.

█ The United States Supreme Court in *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ruled that the Double Jeopardy Clause does not prohibit a retrial if a conviction is reversed. on the basis that the jury's rejection of a defendant's plea of insanity or incompetency is against the great weight and preponderance of the evidence. *See also Meraz v. State,* 785 S.W.2d at 156. Accordingly, the judgment of the trial court is reversed and the case is remanded for a new trial.