Carl **MORANZA**, Jr., Appellant,

v.

The **STATE** of Texas, Appellee.

No. 10–94–226–CR.

Court of Appeals of Texas,
Waco.

Dec. 22, 1995.

Discretionary Review Refused
April 10, 1996.

Rick Davis, Davis & Davis, Bryan, for appellant.

Bill R. Turner, District Attorney, Margaret Lalk, Assistant District Attorney, Bryan, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Appellant Carl Moranza, Jr. appeals his conviction for escape. TEX.PENAL CODE ANN. § 38.06 (Vernon 1994). He raises twelve points of error; that the evidence conclusively established his insanity defense or, alternatively, that the jury's failure to find him insane is manifestly unjust; that the court erred in charging the insanity defense sepa-

rately on each of the three different counts for which he was indicted instead of charging them altogether; that the State failed to timely produce exculpatory evidence as had been properly requested by the defense; that the trial court erred in admitting hearsay statements into evidence; that the court erred in preventing the defense from rehabilitating its expert witness; that the court erred in permitting the State to impeach hearsay statements of Moranza because they related to a collateral matter; that the court erred in refusing to take judicial notice of the fact that insanity was not raised by the defense in an earlier prosecution; that the court erred in permitting the State to put on evidence of a prior conviction; that a tape recording of the events leading to Moranza's being taken into emergency custody was improperly admitted into evidence; and that the court erroneously permitted the State to engage in impermissible jury argument. We affirm.

On June 17, 1993, the Bryan Police Department received a complaint from Lisa Burns that her brother, the appellant, was causing a disturbance at her home and was refusing to leave the premises. Officer Deanna Coleman, Lt. Freddie Komar, and Officer Jackie Maynard responded to the call. During the approximate one-half hour the officers spent at Burns' home with Moranza, he was argumentative, appeared angry, uttered threats against the officers, and suggested that he might kill himself. Due to Moranza's seemingly unbalanced mental state at the time and the apparent danger he posed to people around him, the officers decided to place him into emergency custody and take him to the Brazos Valley Mental Health–Mental Retardation Center so that he could receive help from a medical professional. Tex.Health & Safety Code Ann. § 573.001 (Vernon 1992).

When the officers and Moranza arrived at the MHMR, a psychiatrist, Dr. James Donald Hinkle, was summoned to examine him. After talking with Dr. Hinkle for approximately 15 to 20 minutes, Moranza became irate, and threatened to kill Dr. Hinkle and several nurses who were present. He also threatened to kill Officer Maynard, the only officer present at the time, and started moving toward him. Officer Maynard then informed Moranza that he was going to arrest him for the threats he had made, whereupon Moranza ran out of the room and outside the building. Officer Maynard, however, captured him almost immediately. The threats and the escape which led to Moranza's arrest all occurred essentially instantaneously.

Moranza was indicted for escape, retaliation against a police officer, and aggravated assault against a police officer. Tex.Penal Code Ann. §§ 22.02(b)(2), 36.06 (Vernon 1994). At trial, Moranza raised the affirmative defense of insanity on all three counts. The jury found him not guilty by reason of insanity on the retaliation and aggravated assault counts, but convicted him on the escape count. The trial court sentenced him to a probated ten year sentence in the Institutional Division of the Texas Department of Corrections. The court also committed Moranza to the Rusk State Mental Hospital pursuant to Tex.Code Crim.Proc.Ann. art. 46.03, § 4(d)(1) (Vernon Supp.1996). This appeal followed.

In his first two points of error Moranza asks us to review the legal and factual sufficiency of the evidence to support the jury's implicit finding that he was not insane at the time of the escape. In his second point he contends the evidence is insufficient as a matter of law to support the jury's failure to find him insane, and in his first point he argues that the evidence is factually insufficient, or, in other words, the finding was so against the great weight and preponderance of the evidence as to be manifestly unjust.

Moranza's sufficiency arguments, both legal and factual, rely upon a theory of law that has gone through tremendous change and scrutiny in recent history. To put his arguments in perspective, it will perhaps be best to briefly recount the history of legal and factual sufficiency review in both criminal and civil cases in Texas.

Between 1891, when the Court of Criminal Appeals was created, and 1981, the intermediate courts exercised jurisdiction solely over civil cases. During this time, the intermediate courts, due to the constitutional mandate of article V, section 6, which provided that

the intermediate courts "shall be conclusive on all questions of fact brought before them on appeal or error," commonly engaged in the review of the factual sufficiency of the evidence to support the trial court's judgment. TEX. CONST. art. V, § 6; *Stone v. State*, 823 S.W.2d 375, 378 (Tex.App.—Austin 1992, pet. ref'd—untimely filed) (per curiam); Ellen B. Mitchell, *Factual Sufficiency Review in Criminal Cases*, 58 TEX.B.J. 434, 436 (1995). With the intermediate courts not deciding criminal cases, however, a review of the factual sufficiency of the evidence was never undertaken in criminal cases. *Stone*, 823 S.W.2d at 378; Mitchell, 58 TEX.B.J. at 436. The Court of Criminal Appeals, the only appellate court at the time deciding criminal cases, operated under the notion that, because the conclusivity clause stated that the intermediate courts had the final word on questions of fact, it was constitutionally prohibited from reviewing the factual sufficiency of the evidence. *White v. State*, 591 S.W.2d 851, 855 (Tex.Crim.App.1979), *overruled by Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App.1994). In 1981 the intermediate courts were given criminal jurisdiction, and the stage was set for a debate about factual sufficiency review in criminal cases. *Stone*, 823 S.W.2d at 378; Mitchell, 58 TEX. B.J. at 436.

The Texas Supreme Court, both prior to the addition of criminal jurisdiction to the intermediate courts and afterwards, had little difficulty in construing the conclusivity clause. The Supreme Court determined that the clause permitted the intermediate courts to conduct factual sufficiency review but precluded it from addressing a factual sufficiency issue. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633–36 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); Mitchell, 58 TEX.B.J. 434–36. After 1981, with the intermediate courts of appeals exercising both criminal and civil jurisdiction and with the conclusivity clause expressly reserving to the intermediate courts the ability to determine the facts in both civil and criminal cases, one might suspect the Court of Criminal Appeals would simply have adopted the Supreme Court's view on the appellate review of factual sufficiency challenges. Instead, the Court in *Combs v.*

*State*, 643 S.W.2d 709 (Tex.Crim.App.1982), *overruled by Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App.1989), while determining that it has jurisdiction to review the legal sufficiency of the evidence under the *Jackson* standard, observed that neither it nor the intermediate courts, due to the higher burden of proof in criminal cases, had the authority to review the factual sufficiency of the evidence in criminal cases. *Id.* at 716 n. 1; *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The Court of Criminal Appeals retreated from its absolute prohibition against any consideration of the factual sufficiency of the evidence when it decided *Van Guilder v. State*, 709 S.W.2d 178 (Tex.Crim.App.1985). At issue in *Van Guilder* was the sufficiency of the evidence to support the jury's rejection of the defendant's insanity defense. Rejecting a proposal to determine whether the jury's implicit finding of sanity at the time of the offense was against the great weight and preponderance of the evidence, the Court instead chose to fashion a quasi-*Jackson* standard to address the particular concerns of the insanity defense. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. In recognizing that the defendant bears the burden of proof and persuasion in raising his insanity defense and that the level of proof required is only a preponderance, the Court made appropriate adjustments to the familiar *Jackson* standard. The Court in *Van Guilder* wrote:

> Because some review of the affirmative defense is necessary in such cases in order to afford an appellant due process under *Jackson* ... this Court, in keeping with the principles of *Jackson* ... must provide a standard of review consistent with constitutional law in this area and the inviolability of the jury as fact finders in Texas criminal law. Therefore, we hold that in reviewing a case involving an affirmative defense, the court of appeals must review the evidence on the affirmative defense by looking at the evidence in the light most favorable to the implicit finding by the jury with respect to such affirmative defense and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could

have found that the defendant failed to prove his defense by a preponderance of the evidence. The court of appeals is limited in its review using this preponderance standard to evidence submitted on the issue of the affirmative defense in question. This review is called for when the defendant is contesting the sufficiency of the evidence to support his conviction because of his assertion that he adequately proved his affirmative defense. It is important to note that this analysis does not involve the appellate court in any fact finding function. The test evaluates the legal sufficiency of the evidence using a legal standard. There must be no reweighing or reclassifying of the evidence by the appellate court.

*Van Guilder*, 709 S.W.2d at 181. The standard enunciated in *Van Guilder*, consequently, rose beyond a simple review of the factual sufficiency of the evidence; indeed, the Court stated its standard did not involve the reweighing of the evidence. It amounted to a conclusion as a matter of law that the defendant had established his affirmative defense and, therefore, was entitled to an acquittal from the charges.

However, the Court overruled *Van Guilder* in *Meraz v. State*, 785 S.W.2d 146 (Tex. Crim.App.1990). There, it concluded that the conclusivity clause precluded it from utilizing a quasi-*Jackson* standard to apply to issues where the criminal defendant bears the burden of proof. *Id.* at 153. The Court replaced the quasi-*Jackson* standard with the familiar standard of review the Texas Supreme Court had adopted for the intermediate courts in reviewing the factual sufficiency of the evidence in civil cases. The Court held:

> [W]hen the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved his affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the

great weight and preponderance of the evidence so as to be manifestly unjust.

*Id.* at 154–55.

In *Bigby v. State*, 892 S.W.2d 864 (Tex. Crim.App.1994), the Court reaffirmed its position that the intermediate courts can review the factual sufficiency of an issue upon which a criminal defendant bears the burden of proof by extending the *Meraz* holding to its review of death penalty cases. The Court held that it should be able to conduct a review of the factual sufficiency of issues where the defendant has the burden of proof in capital cases because, otherwise, there would be no appellate court that could undertake the factual sufficiency analysis. *Id.* at 875.

The question not answered by either *Meraz*, *Bigby*, or their progeny, however, is whether an issue upon which the criminal defendant bears the burden of proof could be established as a matter of law. Assuming—without deciding—whether such review is permissible, we will review the evidence to determine if Moranza established his insanity defense as a matter of law.

The Tyler Court of Appeals within the past six months adopted the civil standard of review for determining whether a criminal defendant has proven as a matter of law an issue on which he bears the burden of proof. *Cover v. State*, 913 S.W.2d 611, 619 (Tex. App.—Tyler 1995, pet. ref'd) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989)). The Court held:

> In reviewing whether a disputed matter has been established as a matter of law, we must first examine the record for evidence which supports the finding while ignoring all evidence to the contrary. [*Sterner*, 767 S.W.2d at 690]. Only if there is no evidence to support the finding, do we examine whether the contrary is established as a matter of law.

*Id.*

Moranza makes two separate and distinct arguments in support of his position that the evidence is legally insufficient to support the jury's implied finding of sanity on the escape

**724**

count. First, citing *Van Guilder*, he states that the evidence he presented on his insanity defense established the defense as a matter of law. Second, he argues that, because the jury found him not guilty by reason of insanity on the aggravated assault and retaliation charges, the jury was not at liberty to find him guilty on the escape count because the events which led to all three charges occurred at the same time.[1]

■ Addressing Moranza's first argument, we find that there is evidence to support the jury's failure to find insanity on the escape count. Dr. Hinkle, the doctor who examined Moranza when he was brought to the Brazos Valley MHMR, testified, although not as an expert witness, that he believed Moranza was sane at the time of the offenses. *See Schuessler v. State*, 719 S.W.2d 320, 329 (Tex.Crim.App.1986) (jurors need not make their determination on an insanity defense solely upon expert testimony), *overruled on other grounds, Meraz v. State*, 785 S.W.2d 146 (Tex.Crim.App.1990). Accordingly, Moranza's matter-of-law challenge must fail. *Cover*, 913 S.W.2d at 619.

■ Moranza's second argument is essentially a complaint that inconsistent verdicts are invalid. Inconsistent verdicts, however, do not of themselves require a finding of legal insufficiency to support the findings adverse to the criminal defendant. *See Ruiz v. State*, 641 S.W.2d 364, 366 (Tex.App.—Corpus Christi 1982, no pet.); *see also Dunn v. United States*, 284 U.S. 390, 392–93, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *Commonwealth v. Trill*, 374 Pa.Super. 549, 543 A.2d 1106, 1111 (1988). The conclusion does not necessarily follow that the jury has decided to convict a defendant on insufficient evidence when it renders inconsistent verdicts. The jury may simply be exercising its desire to be lenient or to execute its own brand of executive clemency. *Ruiz*, 641 S.W.2d at 366.[2] Accordingly, instead of summarily finding the evidence legally insufficient to

support the jury's verdict of guilt, the appellate court should examine the legal sufficiency of the evidence to support the counts on which a conviction was rendered. *Id.; Trill*, 543 A.2d at 1111. Having found that the evidence is legally sufficient to support the jury's rejection of Moranza's affirmative defense, we overrule point two.

■ In his first point of error, Moranza argues that the jury's rejection of the insanity defense on the escape charge is against the great weight and preponderance of the evidence. The proper standard of review of a jury's failure to find an affirmative defense was laid out in *Meraz* and is whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz*, 785 S.W.2d at 155.

■ The courts of appeals in criminal cases are constitutionally vested with the authority to determine whether a jury finding, at least on an issue upon which the defendant bears the burden of proof, is against the great weight and preponderance of the evidence. TEX. CONST. art. V, § 6; *Meraz*, 785 S.W.2d at 154; *Olivier v. State*, 850 S.W.2d 742, 744 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd); *see Bigby*, 892 S.W.2d at 875. The courts of appeals do not have to accept the implicit finding by the jury that the appellant did not prove his affirmative defense by a preponderance of the evidence if such finding is irrational. *Olivier*, 850 S.W.2d at 744. The issue is the adequacy of the proof of insanity which the defendant presented in discharging his burden of proof and burden of persuasion, and whether the jury's implicit rejection of that proof is so against the preponderance of the evidence as to be manifestly unjust. *Id.* We must consider the facts elicited at trial on Moranza's insanity defense to resolve the issue. In undertaking this examination, we are mindful of the definition of insanity, which provides that it is an affirmative defense to prosecu-

---

1. The first of Moranza's two arguments in his legal sufficiency points was not raised in his main brief but was subsequently added post-submission in a letter brief. In the interest of justice we will consider the argument on appeal. TEX.R.APP.P. 74(d); *Garcia v. State,* 887 S.W.2d 862, 867 (Tex.Crim.App.1994).

2. The rule on inconsistent verdicts is the same whether the inconsistency relates to the elements of the charged offenses or an issue upon which the defendant bears the burden of proof.

tion that, at the time of the charged offense, the accused, due to a severe mental disease or defect, did not know that his conduct was wrong. TEX.PENAL CODE ANN. § 8.01(a) (Vernon 1994).

Moranza cites to a number of different facts to support his argument. The first is the testimony of Dr. Gary Newsom, the psychiatrist appointed by the court to determine whether Moranza was insane at the time of the alleged offenses. Dr. Newsom testified unequivocally that it was his opinion that Moranza was insane on the date of the offenses and that he could not know right from wrong at that time due to the mental illness, paranoid schizophrenia, from which he was suffering at the time of the charged offenses.

The second is the relative weakness of the testimony by Dr. Hinkle, the State's only witness to directly controvert Dr. Newsom's testimony. Dr. Hinkle examined Moranza at the Brazos Valley MHMR on June 17 for about 20 minutes and from that examination, along with information he received from other sources about him, opined that he was sane at the time of the alleged offenses. Dr. Hinkle, however, had only testified once or possibly twice in his thirty year career about whether a person was legally insane. Furthermore, Dr. Hinkle, who testified because he was the psychiatrist who initially examined Moranza at the Brazos Valley MHMR on June 17, was never formally presented as an expert witness to the court. *But see* *Schuessler*, 719 S.W.2d at 328.

The third is testimony from Moranza's brother that Moranza received no half-way house treatment or any other such readjustment treatment before he was released from prison in May 1993 after serving seven years of a seven year sentence for a prior offense.[3]

Fourth, several witnesses testified to Moranza's anxious and agitated state on the date of the alleged offenses. The police officers

who first investigated the disturbance at Moranza's sister's home handcuffed Moranza, not to arrest him for criminal activity but for emergency medical detention. One of these officers testified that Moranza stated at the Brazos Valley MHMR that the officers were going to have to shoot him in the back and commented that he did not care whether he lived or died. Two of these officers testified that Moranza, at his sister's home, appeared suicidal and talked about hurting himself.

The State, in attempting to refute Moranza's evidence of insanity, elicited testimony from Dr. Newsom that, while he was medically certain that Moranza was suffering from paranoid schizophrenia on the date of the alleged offenses, Moranza exhibited symptoms that could have led another psychiatrist to conclude that he was merely antisocial—the difference being that the latter always knows right from wrong while the former generally does not. Dr. Newsom was also impeached with a report of a psychiatric evaluation made of Moranza several months before the events which led to the three charges. The report, which was admitted into evidence, revealed facts about which Dr. Newsom was unaware when he performed his evaluation of Moranza at the Brazos Valley MHMR. In the report were conclusions from medical personnel at the Harris County MHMR that Moranza was merely antisocial instead of a paranoid schizophrenic, that he might be a malingerer, that his hallucinations dissipated once he stopped abusing cocaine and alcohol, that his statements about his mental health to the Harris County MHMR were inconsistent (thereby revealing a disposition towards giving false statements), and other such information.[4]

Testimony was also offered from the three peace officers, Officer Coleman, Lt. Komar, and Officer Maynard, who investigated the incident on June 17, 1993, that Moranza did

---

3. The prior offense was involuntary manslaughter, although this fact was not made known to the jury.

4. Moranza also alleges that the State's efforts at impeachment were ineffectual because the document used for impeachment was a report on Moranza from the Harris County MHMR that was improperly withheld from the defense prior

to trial. In our discussion of Moranza's fourth point of error, below, we conclude that the State's use of the report was permissible. We should note, however, that Dr. Newsom did state that, despite the State's efforts at impeachment, his diagnosis would remain the same even after considering the additional information contained in the Harris County MHMR report.

not appear irrational, confused, or afraid at the time they arrived. To the contrary, they testified that he seemed angry and that he seemed to speak deliberately and with a consciousness of the probable effects of his words, although Lt. Komar did indicate that Moranza occasionally spoke in outbursts of anger. Officer Maynard, on the other hand, testified that Moranza stated that he believed everyone was out to get him and that he would be harassed even if he were left on a deserted island.

The State also elicited testimony to suggest that Moranza was "faking" his symptoms to fabricate an insanity defense. Denise Fortenberry, an employee at the Brazos Valley MHMR, testified that when she saw Moranza on June 15 he appeared rational and that his only concern was with his lack of employment. When she saw him again two days later, immediately after the incident at Moranza's sister's home, he stated that he was having visual hallucinations. Fortenberry further testified that visual hallucinations can result from the use of cocaine as well as schizophrenia.

The jury also heard a tape recording of the events that occurred at Moranza's sister's home on June 17. The jury could have ascertained from the tape Moranza's mood, whether rational or paranoid at the time, which was an hour or so prior to the events at the Brazos Valley MHMR.

Considering all the evidence indicated above, we cannot conclude that the jury's rejection of Moranza's insanity defense on the escape count was so against the great weight and preponderance of the evidence as to be manifestly unjust. Moranza's first point is overruled.

■ In his seventh point of error Moranza argues the trial court erred when it allowed the jury to render a verdict on insanity on each of the three counts separately instead of simply addressing the insanity issue on an all-or-nothing basis. Moranza admits that he did not object to the court's charge; nevertheless, he asserts the error was fundamental because it was so egregious and created such harm that it deprived him of a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 172 (Tex.Crim.App.1984).

Assuming there was error, we cannot find that it was so egregious that it deprived him of a fair and impartial trial. *Id.* The jury was still able to consider his insanity defense on each of the charges, and, as we indicated above, the rendition of inconsistent verdicts is not necessarily improper. In fact, the error may have actually worked in Moranza's favor. Instead of exercising leniency and finding him not guilty by reason of insanity on two of the three counts, the jury, being forced to consider the defense on an all-or-nothing basis, might have rejected the insanity defense on all three counts. Therefore, Moranza has failed to demonstrate sufficient harm to warrant a reversal under *Almanza*. His seventh point is overruled.

■ In his third point of error Moranza argues that the trial court erred in permitting the State to impeach Dr. Newsom with a psychiatric report created by the Harris County MHMR several months prior to the date of the alleged offenses. The substance of his complaint is that the report was not given to the defense prior to trial, as was ordered by a pretrial discovery order.

Dr. Newsom testified originally as an expert witness for the defense on January 21. In reaching his diagnosis of Moranza, he relied upon an abbreviated summary of the Harris County MHMR report. At the time Dr. Newsom took the stand for the defense, however, both the State and the defense believed that he had relied upon the complete report from the Harris County MHMR in evaluating Moranza's mental state. Nevertheless, neither the State nor the defense was able to produce this report prior to the commencement of the trial. On January 24, after Dr. Newsom had completed his testimony, the State was given a copy of the Harris County MHMR report by the Brazos County probation department. The complete report apparently contained information that was damaging to Dr. Newsom's testimony on January 21, but this damaging information was not included in the abbreviated summary Dr. Newsom had consulted when examining Moranza. As indicated above in our discussion of Moranza's first point of error, the report contained conclusions from medical

personnel that Moranza was merely antisocial instead of a paranoid schizophrenic, that he might be a malingerer, that his hallucinations were not caused by mental illness but by his abuse of cocaine and alcohol, and that he made inconsistent factual statements to the medical personnel at the Harris County MHMR.

Moranza's complaints to the trial court do not comport with his argument on appeal. When the State informed the court and the defense that it wished to use the Harris County MHMR report to impeach Dr. Newsom's testimony, Moranza raised several arguments in contravention. First, he argued that the State wanted to use the report to suggest that Dr. Newsom was not thorough in his examination and such impeachment would be improper because it would relate to an irrelevant collateral matter. Second, he asserted that the communications between himself and the Harris County MHMR personnel were privileged under TEX.R.CRIM. EVID. 510. Third, he contended the State could not bring out any statements in the report made by him to impeach the statements he made to Dr. Newsom because, under TEX.R.CRIM.EVID. 806, such impeachment is permissible only if the declarant had previously testified in another hearing under oath and subject to cross-examination, *see* TEX. R.CRIM.EVID. 801(e)(1), and Moranza had not previously testified in any such manner. And fourth, he argued that hearsay statements from the medical personnel at the Harris County MHMR were impermissibly being read into the record. Moranza also orally raised a motion in limine to preclude any mention of his prior drug and alcohol abuse because such information was inadmissible under Rules 404(b) and 510 of the Rules of Criminal Evidence.

Our review of the record reveals no mentioning of a complaint to the trial court that Moranza was not timely provided the Harris County MHMR report. Indeed, Moranza

expressly indicated to the court that he was not concerned with this issue. When the trial court asked Moranza's attorney, after a particular series of requests for judicial notice in front of the jury, whether he was trying to infer to the jury that the State had "sandbagged" Dr. Newsom by not providing him a copy of the report at an earlier date, Moranza's attorney responded, "No, Your Honor, I'm not trying to prove that." Because Moranza's complaint on appeal does not comport with his arguments to the trial court, his point was not preserved and he, therefore, waived any error that may have occurred. TEX.R.APP.P. 52(a); *Garcia v. State*, 887 S.W.2d 862, 874 (Tex.Crim.App. 1994). His third point is overruled.

■ In his fourth point of error Moranza complains the trial court erred in permitting the State to impeach Dr. Newsom with several hearsay statements included in the Harris County MHMR report. While Moranza does not specifically indicate which of the statements in the report were improper, his citations to the record reveal just one statement about which he could possibly complain—a statement made by a psychiatrist who examined him at the Harris County MHMR, Dr. Stephen Dilsaver.[5] The statement reads:

> [Moranza] has been ... inconsistent in his histories regarding the psychiatric illness, substance abuse, and reports of visual and auditory hallucinations. [He] also requests help with his lawsuit against [the Texas Department of Corrections.]

Moranza argues that the State's references to this statement by Dr. Dilsaver amounted to an impermissible admission into evidence of hearsay statements.

A party may cross-examine an expert witness about the basis of his opinion testimony. TEX.R.CRIM.EVID. 703. The State here was attempting to challenge the basis upon which Dr. Newsom concluded that Moranza was

**5.** Moranza's citations to the record also reveal a concern about false statements given to Dr. Newsom and the Harris County MHMR personnel, but the record further indicates that Moranza's concern was only with the State attempting a "back-door" approach at introducing evidence of prior bad acts in violation of TEX.R.CRIM.EVID.

404(b). In the State's impeachment of Dr. Newsom, no reference was made to any prior bad acts; therefore, any arguments about hearsay statements by Moranza in the Harris County MHMR report were either waived or are not relevant.

insane at the time the alleged offenses were committed. The thrust of the State's questioning was that Dr. Newsom might have reached a different conclusion if he had been aware of the additional information included in the complete Harris County MHMR report. The fact that the complete Harris County MHMR report may have contained hearsay statements from Dr. Dilsaver is of no moment. *See id.; Ladner v. State,* 868 S.W.2d 417, 428 (Tex.App.—Tyler 1993, pet. ref'd). Moranza's fourth point is overruled.

■ In point of error five Moranza argues the trial court erred in not permitting him to sufficiently question Dr. Newsom to rehabilitate him after the State impeached him with the Harris County MHMR report. The record reveals that Moranza was concerned after the State's questioning that the jury would be left with a false impression of the thoroughness of Dr. Newsom's examination of Moranza. More specifically, he was afraid the jury might believe that Dr. Newsom should have discovered on his own the complete Harris County MHMR report at the time he examined Moranza. To counteract this belief, Moranza wished to show that Dr. Newsom was not at fault in failing to locate the report because the State was under a pretrial order to disclose to Dr. Newsom any medical reports previously created on Moranza. The trial court, however, contrary to Moranza's assertions, did not prevent him from undertaking this line of questioning.

After the State had completed questioning Dr. Newsom, Moranza, in front of the jury, asked the trial court if it would take judicial notice of all orders issued in the case thus far. The court responded in the affirmative. Moranza then, again in front of the jury, asked the trial court if it would specifically take judicial notice of the portion of a pretrial order which provided that the State was obligated to disclose to Dr. Newsom any information relevant to the charged offenses. The State then objected, complaining that it was unable to disclose the Harris County MHMR report any earlier than it did because it did not have the report until the time of trial. A discussion ensued concerning whether Moranza was attempting to impugn

the State's motive in failing to disclose the report at an earlier date. The following dialogue occurred:

[STATE]: Your Honor, I can assure the Court I am not intending to impugn Dr. Newsom's professional integrity [or] ability in front of this jury. The point ... that I want to be able to make to the jury is that they have information that Dr. Newsom did not have. Merely that his diagnosis had to be made on the information which he had which was primarily from the defendant.

[DEFENSE]: I disagree.

[STATE]: And by the way, we did not even know that he had been in a hospital until we received Dr. Newsom's report at Tuesday noon before trial—jury selection Wednesday morning.

. . . . .

[DEFENSE]: May I respond?

THE COURT: No, I don't need you to respond. All I want is to make sure that we don't play any games in front of the jury. *I mean you can ask the witness all the questions you want,* but let's be very careful when we start asking me to take judicial notice of contents of the file that indirectly impugned improper motive to one side or the other, intentionally or not[.] And that's why the State became [i]nflamed and that's why I sent the jury out to settle this.

[DEFENSE]: Judge, I'm merely trying to rebut the suggestion by the questioning that this doctor's not thorough and that he's relied on what he has been given.

THE COURT: What does that got to do with me ordering the State to send this man certain papers?

[DEFENSE]: Because, ... the line of questioning has created the illusion that ... he didn't—what I'm getting at, Your Honor, is that this doctor testifies on a regular basis and he relied on what the State provides him.

[STATE]: Your Honor, I'm going to object to relying on what the government provides—

THE COURT: ... I gather that he does not entirely rely on what the State sends

him in view of the fact that at least both of you have reported to me that you've never heard of this Harris County record before; that he got [it] on his own somehow. . . . He's the doctor. Unless it was in the packet of papers the State sent him and they just don't even know about it. He can probably enlighten us on that. All right, I'll bring the jury back in and we'll go from there.

(Emphasis added.)

The above quoted exchange reveals that the trial court never precluded the defense from questioning Dr. Newsom on whether he received the complete Harris County MHMR report prior to trial. Indeed, the court took judicial notice of all the orders in the case, which would necessarily include the particular order relating to the State's obligation to provide Dr. Newsom with all the information it possessed relevant to the offenses charged. That the court did not take judicial notice of Moranza's particular request does not extinguish the general request. In addition, the court expressly told the defense that it could question Dr. Newsom about anything it wished. That the court did take judicial notice of all the pretrial orders and told the defense that it could ask Dr. Newsom any questions it wanted to clearly indicates that the defense was not denied the opportunity to pursue its desired line of questioning. Moranza has failed to demonstrate any error by the trial court in this point; therefore, the point is overruled.

█ In his eighth point of error Moranza complains the trial court erred in permitting the State, in its impeachment of Dr. Newsom, to bring up the fact that Moranza had previously been arrested for "other crimes." He asserts that Tex.R.Crim.Evid. 609(f) requires that the defense receive prior written notice of the State's intention to use these bad acts before they can be used for impeachment, and, because the defense received no written notice of any such intention, the State should not have been allowed to use the bad acts. Moranza's argument is without merit.

Rule 609(f) deals with the impeachment of a witness' credibility based upon his conviction of prior criminal acts that were either felonies or involved moral turpitude. Tex. R.Crim.Evid. 609(a). The State was not attacking the credibility of Dr. Newsom by introducing any evidence that he, Dr. Newsom, had previously been convicted of any crimes. Thus, Rule 609(f) has nothing to do with Moranza's complaint about a back-door effort to bring in evidence of prior arrests. Point of error eight is overruled.

█ In point of error ten, Moranza complains the trial court erred in allowing the State to question a witness, Janice Ray, on a collateral matter. *Arce v. State,* 720 S.W.2d 147, 149 (Tex.App.—San Antonio 1986, pet. ref'd). In his statements to Dr. Newsom, Moranza related that the reason he felt frustrated on June 17, 1993, was because he had an employment appointment arranged through Manpower of Bryan–College Station but he was unable to secure transportation to the job site. In an effort to impeach these statements, the State called Ray, the president of Manpower in Bryan–College Station, to testify that Moranza did not have an employment appointment that day. The State's questioning of Ray did not constitute the impeachment of a collateral matter but, rather, was a proper challenge to the veracity of Moranza's statement to Dr. Newsom. The impeachment of these hearsay statements by Moranza to Dr. Newsom about a Manpower job appointment was permissible under Tex. R.Crim.Evid. 806. Moranza's tenth point is overruled.

█ In his sixth point of error Moranza argues the trial court erred at the guilt-innocence stage in preventing him from introducing into evidence that he did not raise the insanity defense when he was convicted of involuntary manslaughter several years earlier. While the specific offense for which Moranza was convicted was not indicated to the jury, the fact that Moranza had earlier served a prison term was revealed to them. Moranza, accordingly, wished the jury to know that he may have been insane at the time he committed this earlier offense but there was no adjudication of that issue because it was never raised.

The file on this earlier offense, however, was not entered into evidence at the trial

court and is not part of the appellate record. The appellant bears the burden on appeal to see that a sufficient record is presented to show error requiring reversal. TEX.R.APP.P. 50(d). Without the file of this earlier offense in the record, we are unable to address Moranza's complaint. *See Oliver v. State,* 881 S.W.2d 87, 91 (Tex.App.—Houston [1st Dist.] 1994), *vacated on other grounds,* 891 S.W.2d 651 (Tex.Crim.App.1995); *Penix v. State,* 748 S.W.2d 629, 630 (Tex.App.—Fort Worth 1988, no pet.); *Caldwell v. State,* 672 S.W.2d 244, 245 (Tex.App.—Waco 1983, pet. ref'd). Point of error six is overruled.

In his ninth point of error, Moranza argues the trial court erred in admitting into evidence an audio tape recording made by Officer Coleman of the events at Moranza's sister's home on June 17. Moranza claims the tape was inadmissible under Rule 403 of the Rules of Evidence and article 38.22, section 3, of the Code of Criminal Procedure. TEX.R.CRIM.EVID. 403; TEX.CODE CRIM.PROC. ANN. art. 38.22, § 3 (Vernon Supp.1996). Moranza, however, offers no argument in support of his former complaint; therefore, we will only consider the latter. TEX. R.APP.P. 74(f).

Under his article 38.22 argument, Moranza complains the tape is inadmissible because he was not timely provided a copy of it by the State. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 3(a)(5) (defense must be provided a copy of the tape at least 20 days prior to trial). Moranza's reliance upon article 38.22 is misplaced. Article 38.22 governs the admission of visual and audio recordings of incriminating statements made by a criminal suspect under custodial interrogation after an alleged criminal offense has been committed and concerning that alleged criminal offense. *See* TEX.CODE CRIM.PROC.ANN. art. 38.22; *Foy v. State,* 726 S.W.2d 263, 265 (Tex.App.—Waco 1987, no pet.). The events which led to the three charges lodged against Moranza did *not occur* until he was taken to the Brazos Valley MHMR, well after the time the Bryan Police officers arrived at Moranza's sister's home to investigate her complaint. Moranza's sister called the police because Moranza was being disruptive and would not leave her home; these complaints essentially have nothing to do with the events at the Brazos Valley MHMR, which resulted in Moranza being indicted for aggravated assault of a police officer at the MHMR, retaliation against a police officer at the MHMR, and escape at the MHMR. Finding that article 38.22 has no relevance to Moranza's complaint, we overrule his ninth point of error.

In his eleventh and twelfth points of error Moranza contends the trial court erred in overruling his objections to two different arguments made by the State in closing argument at the guilt-innocence phase. First, he asserts that the State argued facts not in evidence when it stated that he failed to seek help for any mental illness from the time of the alleged offenses, June 1993, until he checked himself into the Harris County MHMR in October 1993. Second, he alleges the State made an improper argument about his future dangerousness when it asked the jury to consider what would happen the next time someone had to call the police because he was causing a disturbance.

There are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answers to arguments from the defense; and (4) pleas for law enforcement. *Willis v. State,* 785 S.W.2d 378, 384 (Tex. Crim.App.1989), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990). Considering Moranza's first complaint about the State's jury argument, we find that the evidence did indicate that he did not seek any help for mental illness problems he might have had from June 1993 until September 1993. Our review of the record reveals no direct evidence that was elicited to show that Moranza failed to seek help during this time period; but evidence of the help that Moranza did seek during the relevant time period after June 17, 1993, for mental illness did come out, and there was no evidence that he sought any medical assistance between June and September of 1993. Moranza argues that the reason for this is because he was incarcerated. The fact of Moranza's incarceration, however, does not change the evidence that Moranza did not seek any medical assistance for any mental illnesses. The State's reference to Moranza's failure to seek

medical assistance between June and September of 1993 was a reasonable deduction from the evidence.

 Considering Moranza's second complaint, arguments by the prosecution that the jury should render a guilty verdict due to the future dangerousness of the defendant, if substantiated by the evidence, are proper pleas for law enforcement. *Martinez v. State,* 822 S.W.2d 276, 280 (Tex.App.—Corpus Christi 1991, no pet.) (at guilt-innocence phase); *Long v. State,* 820 S.W.2d 888, 894–95 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd) (guilt-innocence phase); *see Sterling v. State,* 830 S.W.2d 114, 120 (Tex.Crim.App. 1992) (at punishment phase). Moranza's eleventh and twelfth points are overruled.

The judgment is affirmed.