

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOSEPH ANGEL ALVAREZ, | § | No. 08-24-00004-CR |
| Appellant, | § | Appeal from the |
| v. | § | 210th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20210D02640) |
| | § | |

## OPINION

Joseph Alvarez appeals his convictions for murder and aggravated assault with a deadly weapon. On appeal, Alvarez challenges the trial court's denial of his motion to suppress evidence, he complains of trial rulings, and he asserts the jury's rejection of his insanity defense rested on factually insufficient evidence. Finding no error, we affirm.

## I. BACKGROUND

### A. Factual background

Georgette and Daniel Kaufmann lived in a single-family home on 3010 Copper Avenue in El Paso, with their son, a high school senior. Memorial Park, a large community park, was situated

nearby. On Saturday, November 14, 2020, Daniel and Georgette were home alone during the morning hours. Their son left town for a fencing competition. Georgette and Daniel made dinner plans to celebrate their anniversary. After a while, Georgette left the house to visit with her mother as she did most weekends. As day turned into early evening, Daniel played a computer game waiting for Georgette to return. To enjoy the breezy fall weather, he left the back wooden door of the house open, but the outer wrought-iron screen door remained locked.

Daniel heard what sounded like someone jiggling or turning the doorknob of the back screen door. Thinking Georgette needed help getting into the house, he went to unlock the door. Unexpectedly, he saw a "large figure" walking down the steps leading to their detached garage. As Daniel looked through the screen, he accidently hit his hand on the door handle, causing a loud noise. The dark figure turned, came back up the steps, and stood in front of him on the other side of the screen. Daniel did not recognize the person standing there. Just as Daniel started to back away from the door, he noticed the stranger raise his right hand. He then saw a gun—and though Daniel did not remember hearing a discharge—he felt blood running down his forehead. Daniel thought to himself, "[t]his is how I'm going to die." As panic sat in, he first ran to the master bedroom before changing his mind, thinking to himself, "If he gets in this house, I'm dead." Daniel decided instead to run out the front door to a neighbor's house. As Daniel collapsed at his neighbor's door, he asked his neighbor to call 911. The call was made at 1935 hours, or 7:35 p.m. During the neighbor's frantic 911-call, Daniel can be heard giving out Georgette's phone number as he wanted police to warn her not to come home.

When responding officers of the El Paso Police Department (EPPD) arrived on scene, they checked the exterior of the Kaufmann's residence. The garage door of the house was open, and a vehicle was parked with its engine still running. Outside the driver side of the vehicle, officers

2

found Georgette's body lying lifeless on the ground. An officer on scene confirmed she had no pulse. Georgette was shot five times at close range.

Daniel was shot three times. Before being transported for treatment, he provided officers with a description of the individual who shot him. He told officers he had never seen the person before that night. Daniel was treated as a level 1 trauma patient. He remained hospitalized for days in critical condition. At one point, a hospital worker asked him for contact information in case of an emergency. When Daniel responded by naming Georgette, the worker looked confused. Daniel testified that only then did he understand Georgette had died.

Having minimal leads on the identity of the unknown assailant, an El Paso Police Department detective applied for and obtained warrants to seize historical location data generated by cell phones and other devices, as routinely collected by an electronic communications service provider, and limited to data generated only by those devices in the near area of the Kaufmann's home at the time of the shooting. Pursuant to a three-step process, these Geofence warrants compelled Google, Inc., to provide anonymized user identities of devices located within a prescribed geographical area, on a certain date, and for a limited window of time. From seized data, investigating officers identified one device as a "device of interest" based on data reflecting that it remained in the defined area on the date in question, from 6:46 p.m. to 7:28 p.m., and it also travelled away from that location, at 7:34 p.m., or one minute before neighbors called 911 to report the shooting. The geofence analysis also revealed a second device that was later confirmed as belonging to an indirect witness. Officers eventually interviewed a female who reported that she walked around the park on the date and time in question. She observed a dark, mid-sized SUV flash its headlights several times while it remained parked along the curb in front of 3008 Copper Avenue, near the Kaufmann's home.

Based on the information returned, officers eventually identified a Google account tied to a device of interest. After reviewing further location points, the account was eventually identified as being owned or used by Alvarez. Officers next obtained warrants for the contents of Alvarez's email and his social media accounts. From these accounts, officers discovered a 22-page email titled "Judgment Day," which was sent by Alvarez's account on the morning of the shooting, at 8:17 a.m. The long, rambling email ended with the following: "Later I will be going to memorial park those houses on the corner are generational cursed family. . . . Tonight I going to take my silnced pistol in a pizza box. Ring the doorbell and . . . ask if they voted for 'sleepy Joe' and you see I say WITH THE FISHES MOTHERFUCKER!!" Officers later sought and obtained an arrest warrant for Alvarez himself along with the contents of his phone, and they executed a search of his residence.

## B. Procedural background

Alvarez was charged by indictment with one count of murder for the death of Georgette, and one count of aggravated assault with a deadly weapon for injuries caused to Daniel. *See* Tex. Penal Code Ann. §§ 19.02(c), 22.02(a)(2). During the pretrial portion of the case, the State sought orders requiring Alvarez to submit to a state-sponsored psychiatric or psychological exam. For his part, Alvarez also filed pretrial motions to suppress evidence and for appointment of an expert to perform a mental health examination to assess his competency and sanity. Contending the Geofence warrants lacked particularized probable cause, Alvarez urged they were invalid—and irrespective of any reasonable reliance by law enforcement officers—the data or evidence seized should be excluded. Eventually, Alvarez gave notice of his intent to offer an insanity defense. Following hearings, the trial court denied Alvarez's motion to suppress the evidence obtained from the several warrants.

4

During a week-long trial, the State presented evidence to a jury. Among its witnesses, the State called ballistics experts who testified that markings on bullet casings collected at the crime scene linked to a weapon recovered from Alvarez's residence. After the State rested, Alvarez testified in his own defense. Among other things, he testified he believed he was following divine law at the time he killed Georgette and shot Daniel. In support of his affirmative defense, he called James Schutte, PhD, who performed an insanity evaluation and viewed his trial testimony. In rebuttal to that defense, the State presented testimony from Timothy Proctor, PhD, the State's forensic psychologist.

The jury returned a verdict of guilty on murder and guilty on aggravated assault with a deadly weapon, rejecting Alvarez's insanity defense as to each charge. After the punishment phase of trial, the jury assessed confinement for life on the murder conviction; and 20 years' confinement on the assault with a deadly weapon conviction. The trial court signed judgments of conviction in accordance with the jury's verdicts. Alvarez filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## II. THE SEARCH WARRANTS

In four issues, Alvarez contends the trial court erred in denying his pretrial motion to suppress evidence seized through warrants issued to Google, Gmail, Facebook and Instagram. As well, he contends the trial court erred in denying his motion to suppress evidence seized from his residence and cellphone.

### A. The Fourth Amendment and the standard of review

"The Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *Stanford v. State of Tex.*, 379 U.S. 476, 481 (1965) (quoting U.S.

Const. amend. IV). Finding these words to be precise and clear, the United States Supreme Court interprets them to require a warrant to meet three standards: (1) it must be issued by a neutral, disinterested magistrate; (2) it must be supported by probable cause that the evidence sought will aid in a "particular apprehension or conviction for a particular offense"; and (3) it must particularly describe the things to be seized and the place to be searched. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Here, only the second and third standards are at issue.

The issuance of a warrant is supported by probable cause if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a fair probability that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued. *State v. Jordan*, 342 S.W.3d 565, 568–69 (Tex. Crim. App. 2011). "The magistrate may interpret the affidavit in a non-technical, common-sense manner, and may draw reasonable inferences from the facts and circumstances contained within its four corners." *Id.* at 569. We give great deference to the magistrate's determination of probable cause and, on review, only ensure the magistrate had a substantial basis for concluding probable cause existed. *Id.* The particularity requirement is related to the probable cause requirement because it allows the magistrate to determine whether probable cause exists for the requested search. *Bonds v. State*, 403 S.W.3d 867, 875 (Tex. Crim. App. 2013). Among the objectives of requiring particularity with respect to the place to be searched and things to be seized are: (1) limiting the officer's discretion by narrowing the scope of the search, and (2) minimizing the danger of searching the person or property of an innocent bystander or property owner. *Id.* at 874–75. Primarily, the requirement is "meant to prevent general searches and the seizure of one thing under a warrant that describes another thing to be seized." *State v. Powell*, 306 S.W.3d 761, 765 (Tex. Crim. App. 2010).

We typically review a trial court's ruling on a motion to suppress under a bifurcated standard, giving almost total deference to credibility determinations and findings of historical facts, but reviewing de novo its application of the law to the facts. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). However, when the trial court is determining probable cause to support issuance of a search warrant, there are no credibility determinations, rather the trial court is constrained to the four corners of the affidavit. *Id*. Accordingly, when reviewing the magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant. *Id.* As long as the magistrate had a substantial basis for concluding probable cause existed, we will uphold the magistrate's decision. *Id.* We may not analyze the affidavit in a *hyper-technical manner* but in a commonsensical and realistic manner, deferring to all reasonable inferences that the magistrate could have made. *Id.*

## B. The Geofence warrants

In his first issue, Alvarez contends the trial court erred in denying his motion to suppress evidence seized through three Geofence warrants.[1] All three warrants were substantively identical except for their warrant numbers and issuance date. Two were signed on the same date, November 24, 2020, while the third was signed on April 23, 2021. The warrants ordered Google, LLC (GMAIL) to turn over to police the "Gmail (Google) GPS, Cellular, Wi-Fi, or Bluetooth sourced location history data," that corresponded to "devices that reported a location within the geographical region bounded by the latitudinal and longitudinal coordinates . . . located at 3010

---

[1] In *Wells v. State*, 714 S.W.3d 614, 616 n.1 (Tex. Crim. App. 2025), the Court provided the following description of Geofence warrants: "While traditional court orders permit searches related to known suspects, geofence warrants are issued specifically because a suspect cannot be identified. Law enforcement simply specifies a location and period of time, and, after judicial approval, companies conduct sweeping searches of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe, both defined by law enforcement."

Copper, located in the City/County of El Paso, Texas." The "Initial Search Parameters" limited the search of stored data to the date of November 14, 2020, 6:00 pm MST to 8:00 pm MST. The geographical area identified encompassed "[a] radius of 400 [f]eet around" the specified latitude and longitudinal coordinates.

In his warrant affidavit, Detective Adrian Garcia described his educational background and length of time working as a commissioned officer. Based on his training, experience, and conversations with other law enforcement officers, he attested that most people in today's society possessed cellphones and other items used to communicate electronically; that most people carried cellphones on their person outside of their residences; and that most cellphones included global positioning systems (GPS) and other technology for determining a more precise location of the device. He noted that Google collected and retained location data from Android enabled devices. He believed the data would show the movements of the suspect's mobile device and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the ongoing criminal investigation. Garcia attested he believed the responsive location-history data could reveal the device user's location leading up to, at the time of, and after the murder on November 14, 2020. Garcia cited a study determining that either Android or Apple operating systems supported 99.9% of all smartphones. Specifically, Android supported 85.9% while Apple supported 14%. Although the Android operating system was developed by Google as a proprietary operating system, Apple products also supported various Google applications requiring users to have an associated Google account.

Providing the circumstances of the offense under investigation, Garcia further attested: (1) that EPPD was dispatched on November 14, 2020, at 1935 hrs., to 3010 Copper in reference to a shooting; (2) responding officers met with Daniel, a victim who was the owner of the residence,

who was shot multiple times by a man who approached the rear door leading to his backyard; (3) Daniel described his assailant as a Hispanic male, approximately 6'2", bald, with a goatee, and wearing a blue heavy jacket with a hoodie underneath and jeans; (4) after checking the exterior of the residence, officers discovered Georgette's lifeless body lying next to a running vehicle in the detached garage and bullet casing were observed next to her body; and (5) EPPD's investigation had thus far yielded no viable leads. Garcia continued that it was likely Google's location-history database would assist officers in identifying witnesses and suspects in the case. Garcia's affidavit additionally contained an aerial-view photograph of Memorial Park and its immediate surrounding area. The search warrants obtained incorporated Garcia's affidavit and authorized a three-step process.

Under Step 1, Google was ordered to provide location data for any devices located inside the geofence area within the designated timeframe. As for evidence seized, officers testified the warrants executed on Google returned data showing a combined two hundred and two location-data-points from 29 devices. The data remained "anonymized," meaning no personal identifying information was disclosed. In Step 2, investigators reviewed Step 1 data and eliminated any devices readily identifiable as *not* having been in the target location a sufficient amount of time to constitute evidence. To further narrow the data, investigators sought contextual location coordinates for 17 of the original 29 devices. The additional data would tell investigators whether the devices were in the area for very little time, an extensive amount of time, or were just passing through the designated radius. In doing so, officers extended the original 2-hour-timeframe by 30 minutes in either direction.

In Step 3, investigators narrowed their suspect-device pool to 5 devices. It was only then that Google "unmasked" the subscriber-account information for each of the 5 devices. A subscriber

account of one of those 5 devices used the following email address: "russelshacklford79905@gmail.com." With further steps involved, this account was later identified as belonging to Alvarez. The identifying information that led directly to Alvarez was only revealed in the last step of the investigation.

### (1) Applicable law

Most recently, the Court of Criminal Appeals described the use of geofence warrants as "a relatively new phenomenon," which have only received attention in courts "since 2016." *Wells v. State*, 714 S.W.3d 614, 621 (Tex. Crim. App. 2025) (plurality op.) (quoting Note, *Geofence Warrants and the Fourth Amendment*, 134 Harv. L. Rev. 2508, 2509−10 May 2021). Consequently, the issue involving the legitimacy of the warrants has been addressed by only a few cases, generally sorting into two categories. *Id*. The first category includes those that are confined, or cover "a relatively small space over a relatively short time, in a remote or rural area, or at a time of day when only the perpetrators of the offense or witnesses would be likely to be present[.]" *Id*. Second, warrants that cover "larger or more congested urban areas over a longer span of time[.]" *Id*. The first category has generally been found to pass constitutional muster, while the second category has *not* since they tend to "infringe upon a greater number of innocent, uninvolved bystanders." *Id*. at 622 (citing *People v. Meza*, 90 Cal. App. 5th 520, 540–41 (Cal. Ct. App. 2023)) (finding a search that did not narrow the search parameters "potentially allowed a location-specific identification of thousands of individuals. . . for whom no probable cause existed. . . . [and] the search of more than 20 acres total over a cumulative period of more than five hours in residential and commercial areas did not meet the fundamental threshold requirement [of particularity]"); *United States v. Chatrie*, 590 F.Supp.3d 901, 929−30 (E.D. Va. 2022) (mem. op.) ("To be sure, a fair probability may have existed that the Geofence Warrant would generate the *suspect's* location

10

information. However, the warrant, on its face, also swept in unrestricted location data for private citizens who had no reason to incur Government scrutiny.").

Which category a given case falls into depends upon factors such as the size of the area covered, the length of time specified, and the circumstances of the offense under investigation. For example, an intermediate state court in California upheld as constitutional a geofence warrant in a murder investigation where the warrant targeted a location "limited to the front yard. . . where the shooting occurred, and the street in front of the house, for the length of two houses in each direction, where the two suspects were seen fleeing after the shooting [by a witness]." *Price v. Superior Court*, 310 Cal. Rptr. 3d 520, 543–44 (Cal. Ct. App. 2023). Additionally, the specified time period for the first stage of the warrant only spanned minutes of time from 10:00 p.m. to 10:22 p.m. *Id.* at 533–34. The California Court of Appeals held the geofence warrant was both supported by probable cause and a model of particularity. *Id.* at 546. Due to the "indisputable common knowledge that most people carry cell phones virtually all the time," the court found there was at least a fair probability that the suspects in the murder would be identified in the search. *Id.* at 542. Because the warrant was limited to a tight window of time and the search covered a narrow area, the court noted "it was likely that any individuals traversing the geofence were either suspects or witnesses to the shooting." *Id.* at 546.

Like *Price*, *Wells* provides guidance to Texas courts. In *Wells*, the geofence warrant under review arose from a capital murder investigation in which the warrant affidavit set out a search of a "[g]eographical area identified as a polygon defined by" four "latitude/longitude coordinates and connected by straight lines." *See Wells*, 714 S.W.3d at 618. The affidavit sought location history data from devices that reported a location within the described polygon during the window of time of 2:45 a.m. and 3:10 a.m. *Id.* During the second stage of the process, the warrant permitted a

search of anonymized information collected for a period of 60 minutes *before* and *after* the initial window of time, but only for a maximum time of approximately two and half hours. *Id.* at 617. Finally, only the third step revealed identifying information that was limited to "those accounts identified as relevant to the ongoing investigation[.]" *Id.*

A plurality of the Court of Criminal Appeals found the warrant affidavit contained sufficient probable cause as it noted "'[i]t is likely that at least one of the four suspects . . . had an Android device on him during the commission of the offense,' since home-invasion-type offenses commonly involve 'someone outside of the residence . . . to keep an eye out for responding police officers.'" *Id.* at 619. The Court concluded the magistrate could reasonably have inferred a "fair probability" or "substantial chance" that the home invaders carried cell phones to keep contact with an outside lookout. *Id*. Additionally, the Court acknowledged that cell phones are "ubiquitous," and it is a well-established fact that "almost everyone possesses a cell phone on or about his person at practically any time of day or night[.]" *Id.* at 624.

*Wells* also found the warrant under review provided sufficient particularity with respect to both the "place to be searched" and the "things to be seized." *Id.* at 625 (quoting U.S. Const. amend. IV). The Court noted the area to be searched was not a high traffic area, especially during the specified time period, and it was not likely that the warrant would have identified many innocent bystanders or passersby who would not have been relevant to the investigation. *Id.* at 625. In other words, the warrant was narrowly drawn and circumscribed to only include grounds where the assailants waited, where they likely escaped to, the front yard of a house where one victim was shot, and the house where another victim was killed. *Id*.

## (2) Analysis[2]

On appeal, Alvarez asserts the warrants at issue: (1) lacked a particularized probable cause; (2) constituted "general" search warrants that were overbroad as to time and place; and (3) constituted "general" searches permitted unbridled discretion to law enforcement without sufficient judicial oversight.

Turning to the record and circumstances of this case, the Geofence warrant affidavit established that officers were actively engaged in a criminal investigation attempting to locate the unknown male figure who shot and killed Georgette and seriously wounded Daniel. As in *Wells*, the critical inquiry before us requires a determination of whether probable cause was properly articulated with particularity—such that the Google location history limited to defined parameters—would contain evidence that could reveal who committed the offenses in question or identify possible witnesses. *See id.* at 624.

Here, the geofence warrant permitted a search of a 400-foot radius under specified coordinates, which ensured it only encompassed the area where the suspect could have been at the time of the offense, or shortly before and after. The covered area was not a congested urban area per se; but rather a residential neighborhood situated near a community park. The window of time only spanned from 6:00 p.m. to 8:00 p.m., close in time to before the crime itself and when 911

---

[2] The State presents a preliminary argument asserting the geofence warrant did not implicate Alvarez's constitutionally protected privacy interests. The Court of Criminal Appeals assumed (without deciding) that geofence warrants are a "search within the parameters of the Fourth Amendment." *See Wells*, 714 S.W.3d at 620 (comparing a Fourth Circuit case holding that geofence warrants did not constitute searches after applying the third party doctrine with a Fifth Circuit case holding that doctrine did not apply to geofence warrants, and also concluding they constituted searches (citing *United States v. Chatrie*, 107 F.4th 319, 332 (4th Cir. 2024), reh'g en banc granted, No. 22-4489, 2024 WL 4648102 (4th Cir. Nov. 1, 2024) and *United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024)). Following the same approach as *Wells*, we also assume (without deciding) that the geofence warrants at issue here did involve searches, which precludes a need for us to address the State's preliminary argument. *See* Tex. R. App. P. 47.1.

calls were received by law enforcement. In his affidavit, Garcia reported that Daniel did not recognize the man who fired a gun at him on the night in question, but he gave a description of his physical appearance. Garcia also attested that most people carry a cellphone on their person and Google's location-history database would assist in identifying witnesses and suspects in the case. From the particulars given, the magistrate could have reasonably inferred a "fair probability" or "substantial chance" that a suspect had likely carried a cell phone with him while he committed the offenses. *Id.*

Alvarez argues that the "boilerplate" language in the supporting affidavit—i.e., that most people have cell phones on their person when they leave their residences—was insufficient to support probable cause that a cell phone was present at or near the crime scene on the night in question. However, probable cause for anonymized location data does not require a specific showing that an assailant in fact carried a cell phone with its location services actively enabled at the time in question. *Id.* Addressing the likelihood of an assailant carrying a device on his or her person, the United States Supreme Court has recognized that cell phones are a "feature of human anatomy." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). Magistrates and judges are not required to "check their common sense at the door and ignore the fact that most people 'compulsively carry cell phones with them all the time.'" *United States v. James*, 3 F. 4th 1102, 1105 (8th Cir. 2021). "The core inquiry here is probability, not certainty, and it is eminently reasonable to assume that criminals, like the rest of society, possess and use cell phones to go about their daily business." *Wells*, 714 S.W.3d at 624 (quoting *In re Search of Information that is Stored at Premises Controlled by Google LLC*, 579 F.Supp.3d 62, 78 (D.D.C. 2021)).

Still, Alvarez contends the same boilerplate language that acknowledges the "ubiquitous" nature of cell phones alone "flies in the face of *Baldwin*," which rejected such boilerplate language.

*See State v. Baldwin*, 664 S.W.3d 122, 123, 134 (Tex. Crim. App. 2022). There, however, the Court considered factually different circumstances. In *Baldwin*, unlike here, the Court considered whether boilerplate language "about cell phone use among criminals," was sufficient to establish probable cause "to search a cell phone." *Id*. Also, *Wells* distinguished *Baldwin* after declaring that the "mere possession of the cell phone at the time and location of the offense may well be enough—never mind what is contained in the cell phone—to constitute evidence of the identity of the perpetrator of, or witnesses to, the offense." *See Wells*, 714 S.W.3d at 624 n.14. Here, Garcia attested in his affidavit that Daniel had reported he had seen a man he did not know at his back door and the unknown suspect fired a gun and shot him. Although the suspect's identity remained unknown, Garcia attested the suspect likely would have carried a cell phone on his person as his training and experience had confirmed that most people do. From these facts and general statements, the magistrate who signed the warrants requesting only anonymized data could have reasonably concluded the limited search would reveal information helpful to identifying further data that could eventually lead to witnesses or to the unknown assailant.

As to particularity, we conclude the warrants at issue did not give officers "unbridled discretion" to conduct an overly broad search. Rather, the search warrant was narrowly tailored to capture only location data for suspects and potential witnesses of the offenses as the covered area only encompassed a 400-foot radius during a specified timeframe. This provided a degree of specificity that limited the information police would receive and minimized any infringement on privacy rights of persons who could not reasonably be regarded as either suspects or witnesses to the offenses. *Id.* at 625. To the extent Alvarez complains that additional warrants should have been obtained after the first step of the process, we further disagree. The Court of Criminal Appeals held that when the initial warrant is so narrowly tailored "as to provide probable cause, under the

circumstances, to believe that *whichever* devices were revealed to have been present at the narrowly circumscribed place and time. . . would almost certainly have belonged to legitimate suspects, or potential witnesses, so that any additional disclosure of information via Steps Two and Three would be justified by the same probable cause that supported Step One." *Id.* (citing *Price*, 310 Cal. Rptr. 3d at 546–47).

We conclude the geofence warrants at issue here were supported by probable cause and satisfied the particularity requirement of the Fourth Amendment. The trial court did not err in denying the motion to suppress the evidence obtained through the Geofence warrants. Accordingly, we overrule Alvarez's first issue.

## C.   The Google (Gmail), Facebook and Instagram warrants

Because Alvarez's second and third issues raise similar claims to each other, we address them together. In both, he challenges the constitutionality of search warrants obtained by police in the course of their investigation. The challenged warrants were issued to Gmail, Facebook and Instagram, which provide email and social media accounts.

After obtaining limited location-history data, Detective Abraham Gonzalez sought a warrant for a Google account associated to a suspected party. A judge signed the warrant on August 3, 2021. In his warrant affidavit, Gonzalez disclosed that: (1) his training and experience had led him to believe that activation of Google-enabled devices required users to register a new or existing Gmail account, and those accounts stored location data and search history even when accessed from mobile devices; and (2) Google had the capability of searching for a Gmail account associated to a mobile phone's International Mobile Equipment Identity (IMEI) number. Gonzalez sought information for "Suspected item #1: russelshacklford79905@gmailcom." Alavarez had been identified as the listed owner of the suspected email account. To advance his investigation,

16

Gonzalez sought records associated with the Gmail account, and connected applications and sites, and to include live-and-historical-location data from July 1, 2020, through July 29, 2021. He attested he believed a review of the suspect's search history would reveal information relevant to the ongoing criminal investigation by revealing what the suspect sought and when he sought it. Providing information about the murder under investigation, Gonzalez noted that detectives working the case had met with many park goers but were not able to obtain any useful information. He further referenced that detectives had obtained a Google Geofence Warrant and the seized data indicated that Suspect #1's device was present in the area of the murder.

Also, information was sought for two social media accounts as follows: (1) www.facebook.com/russel.shacklford; and (2) the Instagram account for "russelshacklford." As before, Alvarez was named as "Suspected party #1." Gonzalez's affidavit for these social media accounts detailed his knowledge of the accounts and their widespread popularity. These social media platforms require users to register and create profiles, which would contain personal identifying information. Further, Gonzalez attested that the geofence location-history data had linked Alvarez to a device emitting data from the crime scene, that the device was later linked to a specific email account, and upon receiving further records, the investigation revealed the same party held both a Facebook and Instagram account.

Alvarez complains that insufficient probable cause supported the search warrants issued for the Gmail, Facebook, and Instagram accounts. He argues the affidavit merely included "boilerplate allegations," minimal facts about the incident, the apparent lack of any witnesses, and further claimed that data had been secured from a Geofence warrant reflecting that a device using a Google/Gmail user ID number "was present in the area of the murder." Based on these articulated facts, he contends that a full-scale rummaging through his accounts was not justified consistent

17

with Fourth Amendment requirements. Citing to *Baldwin* once again, he maintains that EPPD lacked evidence of his actual use of his mobile device at the crime scene, either to browse or send email, rather than simply having his phone passively provide location information. *See Baldwin*, 664 S.W.3d at 122 (requiring an affidavit to contain facts and reasonable inferences establishing a nexus between the phone and the offense when seeking authority to search a cell phone). Contrary to this assertion, however, the search warrants sought information for the email and social media accounts connected to the phone's owner and it had already been established that there was a link between the owner's phone and the offense.

"[B]ecause we live in a society in which our phones go wherever we go," facts establishing a nexus between the phone's owner and the offense may suffice in some instances. *See Johnson v. State*, 682 S.W.3d 638, 648 (Tex. App.—Tyler 2024, pet. ref'd) (holding a supporting affidavit for a search warrant for Verizon data records was supported by probable cause when a nexus was established between appellant's cell phone and the crime scene). In other words, probable cause to support the search needed to establish a nexus between the account owner and the offense, not a nexus between the *use* of the phone *during the offense*. *Id*.

Here, the question is whether the supporting affidavit contained sufficient facts from which the magistrate could reasonably determine there was a fair probability that the records held by Google/Gmail, Facebook, and Instagram would implicate Alvarez in the offense. On review, the totality of the circumstances described in the affidavit established the following: that location-history data connected to a Google account registered to Alvarez showed his device had been present in the area of the offense at the relevant time; the email account with a username of "russelshacklford79905" was linked to Gmail, Facebook, and Instagram accounts; and the investigators believed the targeted email and social media accounts would provide information on

18

his involvement in the offense. Based on the articulated facts, we conclude the magistrate had a substantial basis or fair probability to believe that the social media records would reveal evidence implicating Alvarez in the crime being investigated by showing his connection to the victims or the circumstances. Therefore, the search did not violate Alvarez's rights against unreasonable searches, and the trial court did not err in denying his motion to suppress.

Accordingly, we overrule Alvarez's second and third issues.

### D. The warrants for a search of the cell phone and his residence

In his fourth issue, Alvarez contends the trial court erred in not suppressing evidence obtained from the search warrant of the contents of his cell phone and of his residence.[3] Following review of seized evidence, officers obtained a warrant to arrest Alvarez and search his residence for items including firearms, firearm accessories, and any electronic devices. The judge signed the warrant on September 7, 2021. In the supporting affidavit, Gonzalez attested that probable cause existed based on the facts developed during the investigation from the time of the first 911 call through seizure of email and social media account information.

Specifically, Gonzalez recounted that officers viewed Alvarez's cell phone as a device of interest; that a Google search warrant for an account associated to his phone was obtained and executed; the records from Google established the device was owned or used by the email account listed as russelshacklford79905@gmail.com; the data obtained from Google provided 134,000 location points recorded for the device and indicated it had been present in the area of the crime scene on two dates, November 10, 2020, and November 14, 2020, including on the date of the

---

[3] As a preliminary matter, we reject the State's contention that Alvarez waived his complaint about the warrant issued to search his residence. The State asserts defense counsel stated, at the beginning of trial when renewing his suppression challenges, "I have to admit [] that the probable cause for the search of the house itself was sufficient[.]" However, the record shows that Alvarez lodged objections to evidence, like the firearm, which was seized through the warrant authorizing a search of his residence, reasserting his previous suppression arguments.

shooting. Officers traced the resting point of the device to an address of 6231 Gila in El Paso. Research revealed the suspected party's true name as Alvarez, the only party residing at that resting address. The Gmail account led to discovery of a Facebook account. After a warrant was served on Facebook, officers learned that Alvarez had revealed on his account that he had been terminated from his employment for stalking a female co-worker on his day off. The female reported that he waited for her to arrive at work, and once she parked her vehicle, he accosted her. Gonzales asserted the behavior and approach appeared similar to how Georgette had been shot as she exited her vehicle.

Review of Alvarez's social media accounts led EPPD to believe he owned, or at least had access to, a firearm. The Gmail account also revealed that he purchased a firearm suppressor which was shipped to his home address in July or August 2020. Additionally, through social media accounts, EPPD learned of Alvarez's extremist religious and political views and that he had identified Memorial Park as an area of interest. Gonzalez further attested that an email sent by Alvarez explained his intentions to take a silenced pistol to the houses located near Memorial Park. Gonzalez believed that Alvarez had a plan to execute his violent actions on the date of the offense, which led to the murder of Georgette and serious bodily injury to Daniel. He further noted that Alvarez was the only resident of the intended residence to be searched. Gonzalez believed that any information and evidence gathered would be crucial to solving the case.

On review, Alvarez contends that even though the supporting affidavit provided probable cause to believe Alvarez committed the crime, it nevertheless failed to provide information to establish probable cause that evidence of the crime would be found at Alvarez's residence. We disagree. "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a 'fair probability' that contraband or evidence of a crime will be

found in a particular place at the time the warrant is issued." *Jordan*, 342 S.W. at 568–69 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983) and *Schmidt v. State*, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983) (en banc)). Here, the supporting affidavit established that Alvarez bought a firearm suppressor months before the offense, that former co-workers told EPPD that they knew Alvarez owned or had access to firearms, there were images of firearms on Alvarez's social media accounts, and Alvarez stated he was going to take his silenced pistol to the houses near Memorial Park in an email he sent on the morning of the offense.

Alvarez's challenge to probable cause focuses on the details about the suppressor and the timing of EPPD's knowledge of his purchase, asserting there was no evidence presented ensuring the presence of the suppressor at the residence over a year after its purchase. However, with the totality of the attested facts—to include Alvarez's lengthy email titled "Judgment Day," his social media postings, and interviews from coworkers—it was reasonable for the magistrate to infer that a firearm and firearm parts would be found at Alvarez's residence. From the circumstances presented in the supporting affidavit, we conclude the magistrate had a substantial basis to determine that the murder weapon or other evidence of the crime would probably be found in Alvarez's residence. *Jordan*, 342 S.W.3d at 568–69 (holding magistrate who issued search warrant for a blood draw had a substantial basis to determine the evidence of intoxication would probably be found in defendant's blood); *Brooks v. State*, No. 08-15-00208-CR, 2017 WL 6350260, at *14 (Tex. App.—El Paso Dec. 13, 2017, pet. ref'd) (not designated for publication) (holding magistrate who issued a search warrant for search of defendant's belongings for bloody boots had a substantial basis because there were facts in the affidavit that the boots from the crime scene would probably be found in defendant's property); *cf. Cassias v. State*, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986) (holding facts that "brick type packages" were seen and that "several" people, who officer

21

believed were narcotics users, frequented the address, was insufficient to give rise to probable cause that drugs would be found in the residence).

As to the search of his cell phone, Alvarez similarly complains there was insufficient probable cause for the "dump" of the cell phone because no statements explained why the use of the phone had any tie to the commission of the offense. Additionally, Alvarez complains that the phone was not obtained through the search warrant of the residence but instead it was on his person when he was arrested. However, in addressing these challenges, we note the only evidence obtained from his cell phone, photographs of Memorial Park on November 11, 2020, was admitted at trial. Yet, these same photos were introduced earlier in trial, without objection, when the State offered a diagram of Memorial Park. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (holding admission of other similar evidence without objection renders harmless any improper admission). Moreover, the photos were not the only evidence the detectives relied on to link Alvarez to the crime in question. *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc) (stating the primary concern is whether there is a "reasonable possibility" that the error, if any, might have contributed to the conviction). Accordingly, we conclude the trial court did not err in denying his motion to suppress related to a search of his residence and his cell phone.

We overrule Alvarez's fourth issue.

### III. INSANITY DEFENSE

In his fifth issue, Alvarez contends the evidence was factually insufficient to support the jury's implicit rejection of his insanity defense.

22

### A. Applicable law

Because persons accused of a crime are presumed sane, the burden of proof and persuasion falls on a defendant to establish the affirmative defense of insanity by a preponderance of the evidence. *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008); *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993) (en banc); *see also* Tex. Penal Code Ann. § 2.04(d). To do so, the defendant must prove, "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a). "Under Texas law, 'wrong' in this context means 'illegal.'" *Ruffin*, 270 S.W.3d at 592. "If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified." *McDonald v. State*, No. 05-23-00419-CR, 2024 WL 4784421, at *4 (Tex. App.—Dallas Nov. 14, 2024) (citing *Ruffin*, 270 S.W.3d at 592).

"The issue of insanity is not strictly medical; it also invokes both legal and ethical considerations." *Bigby v. State*, 892 S.W.2d 864, 877 (Tex. Crim. App. 1994) (quoting *Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978) (en banc)). Ultimately, whether the insanity defense was proven by a preponderance of the evidence is a decision within "the province of the jury, not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself." *Id.* at 878. Because the insanity defense is not strictly medical, expert witnesses—though capable of giving testimony helpful to the jury in its determination of the ultimate issue—are not capable of dictating its determination. *Graham*, 566 S.W.2d at 949. Instead, "[o]nly the jury can join the non-medical components that must be considered in deciding the ultimate issue." *Id.*

In determining the accused's mental state at the time of the commission of the offense, the circumstances of the crime itself are important, and a jury may consider other factors including a defendant's demeanor before and after committing the crime, attempts to conceal incriminating evidence or to elude law enforcement, expressions of regret or fear of consequences of his actions, and any other possible explanations for defendant's actions. *See McAfee v. State*, 467 S.W.3d 622, 637 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (citing *Graham*, 566 S.W.2d at 951).

## B. Standard of review

"In the factual-sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). Under that standard, a reviewing "court may sustain a defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* In those circumstances, the reviewing "court may reverse the trial court's judgment and remand the case for a new trial." *Id.* at 672.

"Rarely will the fact-finder's determination regarding an insanity defense be overturned on appeal." *Afzal*, 559 S.W.3d at 208. Because the factfinder "is the sole judge of the credibility and weight to be given to the testimony, [it] is free to believe or disbelieve all or part of any witness's testimony." *See id.* If there is conflicting evidence, reviewing courts "defer to the fact-finder's determination regarding the weight and credibility of those decisions because the fact-finder has the benefit of observing the witness' actions and demeanor." *Fisher v. State*, 397 S.W.3d 740, 745

24

(Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). "Evidence that is factually sufficient" to support a rejection of an insanity defense "is necessarily legally sufficient." *Reyes v. State*, 480 S.W.3d 70, 73 (Tex. App.—Fort Worth 2015, pet. ref'd).

## C. Analysis

The jury heard testimony on Alvarez's defense of insanity through his own testimony and from his medical expert. The State also presented its expert in rebuttal.

At trial, Alvarez talked about his childhood and gave other details about his life. When he was in middle school, his mother committed suicide by sitting on a railroad track. He then lived solely with his father. When he reached high school, he planned to join the military, but his father became very ill about the same time. Alvarez changed his plans and took care of his father until he died in 2018. After his father's death, Alvarez lost interest or had little time to maintain a well-kept home. At the time investigators took photographs, his residence had no running water. He described that he went through a succession of jobs—quitting a job near the railroad tracks and then getting fired from the El Paso International Airport for asking a female coworker whether she was saving herself for marriage.

When asked how he spent his time while he received unemployment, Alvarez answered that he played "Battlefield" on a PlayStation, and he would watch movies or search the Internet. Because he had free time and he was not in a hurry to get another job, he would study "the Word of God," read his Bible, on and off, and pray. He described, "I was praying and asking God about holy matrimony, because I was fired over the- over an issue with one of my colleagues at United Airlines." Financially, he was okay; but he was angry about getting fired. Shortly thereafter, he said that "revelation started to happen very quickly."

Alvarez explained that his prayers led him to learn about Adam and Eve, holy matrimony, sex outside of marriage, pregnancy, and abortions. He understood from his reading that "children who are aborted are not eligible to enter heaven." He began studying the Book of Enoch, a book he described as being validated by the Bible in the book of Jude. With those readings and others, he came to learn of the "demonic artwork" of H.R. Giger.[4] From there, he developed his understanding of satanism and how sacrifices were being performed. Due to generational curses, he believed that females aborted their children for a blood sacrifice or an act of satanism.

When asked why he became interested in Memorial Park, Alvarez said he had visited the park during his childhood and returned more recently, in mid-summer. After visiting the park, he purchased a book, titled "Manhattan Heights Historic District." What first drew his attention to the park were the trees. He testified: "And the trees, they grow contorted. There's a strangeness with the trees. They don't appear–they appear to be normal." And he also believed a picnic table and bench in the park was actually an altar used for "satanism." Alvarez testified: "The mother that doesn't want the child will place the baby on the altar and walk away." He believed babies were being sacrificed at Memorial Park.

During this time period, Alvarez began to contact and send thousands of emails to colleagues, friends, churches, and others, notifying them of his revelations on abortions and holy matrimony. He also sent messages through pornography websites in an attempt to tell the actors

---

[4] Swiss artist H.R. Giger is best known for designing the iconic Alien—"from egg to eight-foot-tall monster"—in Ridley Scott's 1979 film *Alien*. Douglas Martin, *H.R. Giger*, *Artist Who Gave Life to 'Alien' Creature, Dies at 74*, N.Y. TIMES (May 13, 2014), https://www.nytimes.com/2014/05/14/arts/h-r-giger-swiss-artist-dies-at-74-his-vision-gave-life-to-alien-creature.html. During his lifetime, he published twenty books showcasing his lithographs, ink drawings, and oil paintings depicting "surrealistic Biomechanical dreamscapes." *Id.*; H.R. Giger Abbreviated Biography, https://www.hrgiger.com/. His works of nightmarish creation continue to contribute to science fiction today. Martin, *supra*.

about what happened to victims of abortions. He had previously sent similar emails to Special Operations Command, the Marine Corps Special Operations Command, the TSA, the U.S. Secret Service, and other military agencies. Alvarez believed he had an influence on public policy because, after his emails were sent, the State of Texas in fact banned abortion. He further believed he had an influence in overturning *Roe v. Wade*.

Providing more detail, Alvarez testified that he believed the people who lived in the houses near Memorial Park were generationally cursed. He described that the limbs of the misshapen trees resulted from their planting of babies. He also believed that a trash can outside a house was used for disposing of human life. Alvarez composed an email, many pages long, titled "Judgment Day," in which he included statements regarding revelations, his studies, and photos of Memorial Park. On the morning of November 14, 2020, Alvarez sent his Judgment Day email to a Military Intelligence Unit at Fort Meade. Alvarez concluded that message with the following lines:

> For public consumption make ready and available the abortion records crossed referenced with display of actual drivers license and real contact info listed. As well as the names of the men that are the listed as father. All of the OATHS that every one took are legitimate. Do as I say! Stop all murder of babies. Later I will be going to memorial park those houses on the corner are generational cursed family that's why they get to live there. Tonight I going to take my silnced pistol in a pizza box. Ring the doorbell and (I know they voted for bidden they had a fagget flag and a doll of President Trump hanging) ask if they voted for 'sleep Joe' and you see I say WITH THE FISHES MOTHERFUCKER!!
>
> Respectfully yours,
> Joseph

Alvarez testified that on the evening of November 14, 2020, he drove to Memorial Park and parked his vehicle on Copper Street. He prayed for guidance as he walked to the house on the corner. He rang the doorbell, and when no one answered, he returned to his vehicle to pray again.[5]

---

[5] The record is unclear on whether he rang the Kaufmann's doorbell or that of a neighbor. For his part, Daniel did not mention he had earlier heard a doorbell ringing at his home.

A few minutes later, he saw a car turn onto the street with its lights turned off. At that moment, he received a revelation telling him the car would turn into a garage. As he watched, the car did turn into a garage. Alvarez described to the jury that, in a pizza box, he held a Glock handgun as he went into the park. There, he believed a misshapen tree also pointed him to the same house, again confirming his revelation. He then followed to see where the vehicle parked and went towards the garage. As he got closer, he prayed before he pulled out his weapon, then he "shot that woman." He believed she was generationally cursed; and she was a witch. Alvarez believed he had shot the woman three times. He then exited the garage and went up a set of stairs. He tried to open the door and a guy behind the door startled him, and he shot the man. He testified he shot the man because he was a "warlock or a fool for giving his seed away to a witch." He testified he did not know either the woman or the man. Alvarez returned to his vehicle, prayed, and then left the scene. After the shooting, Alvarez went back to his home, he did not dispose of the gun, nor did he change his appearance. He did continue sending emails to pro-life groups and churches.

Alvarez testified he did not believe he had committed murder on November 14, 2020. Rather, he believed he was an executioner ordained by God and he "executed" the woman and attempted to "execute" the man because God told him it should be done. He believed he was following God's law. Alvarez confirmed that he followed some of "man's laws," like traffic laws, but under divine revelation, he picked which laws he followed. He acknowledged that he knew murder was a violation of state law and that he would be brought to court for his conduct.

The jury also heard conflicting evidence from experts concerning Alvarez's insanity defense. Dr. James William Schutte, a defense expert, testified that he evaluated Alvarez and diagnosed him with schizoaffective disorder, a combination of a mood disorder and schizophrenia. He explained schizophrenia is a severe mental disease where a person can exhibit hallucinations,

like hearing things, seeing things, or smelling things that are not there. People with schizophrenia can experience delusions and can experience impairment in their daily functions. Schutte testified that Alvarez had a severe mental illness, not just strange or eccentric ideas. He opined that he was much more impaired than just having odd ideas. Further, Schutte testified that Alvarez did not believe his actions were wrong or illegal, but that God wanted him to commit "an authorized taking of life."

The State's expert, Timothy Proctor, Ph.D., testified that Alvarez had a "delusional disorder, grandiose type that includes bizarre content." Proctor agreed with Schutte that Alvarez had a severe mental illness but disagreed with the schizoaffective disorder diagnosis. Proctor further testified that he believed Alvarez knew his conduct was illegal and that he was not insane at the time of the offense. Proctor based his opinion in part on Alvarez's actions before, during, and after the offenses. Proctor testified that Alvarez knew his conduct was something he could be arrested for and would be sent to a "secular court." Specifically, Alvarez committed the offenses at night, wore dark clothing, wore gloves, hid the gun in a pizza box, had a silencer, wore a mask, and fled the scene.

At the close of the testimony, the jury was free to reject Schutte's opinion and accept Proctor's opinion. *See Graham*, 566 S.W.2d at 950–951. Additionally, the jury heard extensive evidence regarding Alvarez's time studying the Bible and other biblical works. He explained how he formed beliefs about Memorial Park. Alvarez argues that he truly held his beliefs and therefore he was insane at the time of his conduct. However, the critical question of the inquiry does not ask about sincerity. Instead, the critical question is whether his mental disease or defect caused him to not know that his conduct was wrong or illegal. Tex. Penal Code Ann. § 8.01(a). The jury heard Alvarez's testimony explaining he knew murder was illegal but that he believed what he did was

29

not murder because God allowed him to be an executioner. For example, the jury heard the following testimony on cross-examination:

> THE STATE: Were you concerned about being, quote, brought to a secular court?
>
> ALVAREZ: Yes.
>
> THE STATE: Because you knew that it was a violation of state law to murder someone, correct?
>
> ALVAREZ: Correct.
>
> THE STATE: Yet you did it anyway; is that correct?
>
> ALVAREZ: Correct.

The jury could reasonably rely on these statements along with other evidence of record to conclude that Alvarez understood his conduct was against the law at the time he committed the offenses. Alvarez's argument that he believed his conduct to be excused by God and he followed divine law does not equate with him not knowing that his conduct was illegal. Rather, he is arguing that he was justified in his actions. *See McDonald*, 2024 WL 4784421, at *6 (holding evidence factually sufficient to support the jury's rejection of appellant's insanity defense where appellant stated she sedated and smothered her children due to delusions and hallucinations that made her believe the children were being sexually abused but acknowledged that she was aware that taking the lives of her children was legally wrong and could result in capital murder charges). When asked why he wore gloves and a mask, he claimed the mask protected him from COVID and the gloves ensured that if there were an investigation, he would not be stopped from spreading the word and sending out more emails.

Based on the trial record, we cannot say that Alvarez established the jury's implicit rejection of his insanity defense was so against the great weight and preponderance of the entire

body of admitted evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 670 n.29, 671. We hold the evidence was factually sufficient to support the jury's decision. *Cf. Olivier v. State*, 850 S.W.2d 742, 745–46 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (holding evidence factually insufficient to support the jury's rejection of insanity defense when appellant believed the devil was among her and thought she was going to hell if she did not kill this "thing" which she was wrestling with in her bed, which turned out to be her daughter and there was uncontroverted medical testimony from three different doctors that appellant was insane at the time of the offense).

We overrule Alvarez's fifth issue.

## IV. ADMISSION OF EVIDENCE

In his sixth issue, Alvarez contends the trial court erred in admitting evidence of a post-arrest "walk-through" video which showed firearms, ammunition, and gun literature inside his residence. Alvarez contends these items of evidence were not relevant, their depiction acted as a 404(b) extraneous act, and any probative value was far outweighed by their prejudicial effect.

We review a trial court's ruling on admission of evidence for an abuse of discretion. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court abuses its discretion when it acts arbitrarily or unreasonably. *Id.* Accordingly, we will "not reverse a trial judge whose ruling was within the zone of reasonable disagreement." *Id.* at 440.

The video Alvarez challenges was introduced by the State as Exhibit 93. The video was taken by Officer David Soto of the El Paso Police Department's Crime Unit. Soto recorded his "walk-through" of Alvarez's residence. Before the State sought to introduce the video into evidence, it brought the previously granted motion in limine regarding weapons to the trial court's attention at a bench conference. The State notified the trial court that the video showed weapons

31

and ammunition that were scattered throughout the residence. The State argued that defense counsel had opened the door to allowing the video's admission by admitting pictures taken of both the outside and inside of the residence during his opening statement.

In response, defense counsel notified the court the defense had reviewed the video and objected to the weapons and ammunition shown in the video because it had nothing to do with the crime in question. Counsel argued that the risk in showing the video was due to its lack of relevance and the prejudicial value exceeding the probative effect of the evidence. Counsel argued that the video tended to show Alvarez as a "gun nut and a very dangerous person," and was improper extraneous evidence.

The State argued defense opened the door to the evidence when it argued: "Look at the way he lives. He's insane." The State asserted that because of this statement it should be able to show exactly how Alvarez lived. The trial court overruled Alvarez's objections and told defense it could raise its objections in front of the jury once the State offered the evidence. Back in front of the jury, the State introduced numerous exhibits to be published. Defense asked to approach the bench again and notified the court it had not had the opportunity to look at the video the State was getting ready to introduce. Defense made a request for the court to view the videos and/or the photos of the walk-through for their prejudicial effect. The trial court agreed to do so *in camera*. Back in front of the jury, the State offered Exhibit 93 into evidence, defense objected "for the reasons expressed at the bench," and the trial court withheld its ruling until it viewed the video. The State then moved to enter multiple pictures of Alvarez's residence. Defense objected based on its previous objections regarding the motion to suppress in that there was insufficient probable cause for the search warrant of Alvarez's residence. The trial court overruled the objections and

32

admitted the exhibits. During a recess, the trial court reviewed the video. The trial court overruled objections and admitted the video.

Alvarez contended that the video showed multiple weapons and ammunition and that the evidence was not relevant, it operated as an extraneous act, and any probative value was outweighed by the prejudicial effect. We conclude Alvarez failed to preserve error on his objections regarding the video because he did not specifically object to which portions of the video should have been inadmissible. Alvarez did not specify portions containing complained of evidence. Although the video is approximately only 25 minutes long, the trial court is not required to sort through challenged evidence to segregate the admissible portion from the inadmissible. *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002); *Ross v. State*, 154 S.W.3d 804, 812–13 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

Moreover, any error in admitting the evidence was harmless. Erroneous evidentiary rulings are ordinarily non-constitutional error that are disregarded if it does not affect substantial rights. *See* Tex. R. App. P. 44.2. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). We consider everything in the record when assessing the likelihood that the jury's decision was adversely affected by such an error, including "testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable." *Id.* "Important factors include the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, and may include whether the State emphasized the error and whether overwhelming evidence of guilt was present." *Id.* Ultimately, we will not reverse for harmful error "if, after examining the record as a whole, we have a fair assurance that [the error] did not influence

the jury, or influenced [it] only slightly." *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (en banc).

Here, Alvarez contends he was harmed by the evidence because his sanity was an issue in the case and the jury did not know the consequences of its verdict. Because the jury did not know that finding Alvarez insane would result in him being hospitalized, he contends the effect of showing the jury weapons and ammunition was to "send a signal to the jury that it should not release this person onto the streets where he has access to all the weapons and ammunition and literature where he may commit another offense." From the previously laid out evidence mentioned above, we conclude the jury's verdict was not meaningfully influenced by unfair prejudice related to the evidence of guns and ammunition as shown by the video of Alvarez's residence. *See Schmutz*, 440 S.W.3d at 39; *Hayes*, 85 S.W.3d at 816. We conclude the trial court did not commit reversible error in admitting the complained of evidence.

We therefore overrule Alvarez's sixth and final issue.

## V. CONCLUSION

We affirm.

GINA M. PALAFOX, Justice

August 13, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)

34